Argued and submitted November 24, 2003, reversed and remanded with
instructions October 13, 2004

# NORTHWEST NATURAL GAS COMPANY,
an Oregon corporation,
*Appellant,*

*v.*

# OREGON PUBLIC UTILITY COMMISSION,
an agency of the State of Oregon,
*Respondent,*
*and*

# WAH CHANG
and Northwest Industrial Gas Users (NWIGU),
*Intervenors-Respondents.*

## 01C-18514; A119010

99 P3d 292

Timothy J. Sercombe argued the cause for appellant. With him on the briefs was Preston Gates & Ellis, LLP.

Judy Carol Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Edward A. Finklea argued the cause for intervenors-respondents. With him on the brief were Chad M. Stokes, and Energy Advocates, LLP.

Before Edmonds, Presiding Judge, and Haselton and Wollheim, Judges

EDMONDS, P. J.

## EDMONDS, P. J.

Appellant Northwest Natural Gas Company (Northwest) is a public utility that has the exclusive right to provide natural gas service to consumers in much of Oregon, including the Albany-Millersburg area. It filed a petition with respondent Oregon Public Utilities Commission (the PUC) for a declaratory proceeding under ORS 756.450, asking the PUC to determine whether actions that several industries contemplated taking were consistent with Northwest's exclusive right to serve the area involved. Respondents Wah Chang and Northwest Industrial Gas Users intervened to defend those actions. After the PUC gave an unfavorable declaratory ruling, Northwest filed a complaint in Marion County Circuit Court to challenge that decision. *See* ORS 756.580. That court affirmed the PUC's decision, and Northwest appeals. ORS 756.610. We reverse and remand.

On appeal, we review the PUC's order, not the circuit court's judgment. Unless the statutory terms at issue are delegative in nature, we review for errors of law. *Utility Reform Project v. PUC*, 171 Or App 349, 353, 16 P3d 516 (2000); *see also* ORS 756.594. Because Northwest sought a declaratory ruling, we state the relevant facts as Northwest described them in its petition; the PUC assumed those facts to be true for the purposes of its decision. Williams Gas Pipeline—West (Williams) owns and operates an interstate natural gas pipeline. The Grants Pass Lateral is a portion of the Williams system that connects to the primary pipeline in Washougal, Washington, and runs to Grants Pass, Oregon, passing through Northwest's allocated territory in the Willamette Valley. Eight of Northwest's former customers have made direct individual connections to the Williams pipeline and receive their gas service from it, bypassing Northwest's system, despite Northwest's offer of discounted rates. Northwest has entered into approximately 20 contracts at discounted rates with other customers who were considering establishing their own direct connections to the Williams pipeline.

Two of Northwest's other current customers have constructed or are considering constructing pipelines to their

facilities that will not connect directly to the Williams pipeline but, rather, will connect to existing bypass pipelines that other customers have constructed. Northwest described the proposed arrangement as a "condominium bypass distribution system" with the following characteristics:

"a.  Two or more privately-owned industrial consumers of natural gas obtain natural gas from a single connection to the [Williams] interstate pipeline.

"b.  The natural gas flows through a single transfer meter at the point of interconnection with the [Williams] interstate pipeline to a designated 'receiving party' as defined by [Williams's] tariff. The receiving party is accountable to [Williams] for the imbalances that occur at the meter.

"c.  The natural gas is transported through a bypass pipeline. This bypass pipeline may be owned by one or more of the condominium bypass participants.

"d.  Two or more lateral pipelines are connected to the bypass pipeline and transport natural gas to individual industrial consumers of natural gas. These industrial consumers are separate legal entities. These lateral pipelines may be constructed after the construction and initial operation of the bypass line and provide an extension of utility service.

"e.  The consumption of natural gas by each of the condominium bypass participants is measured by meters attached to the lateral pipelines. Daily gas flows and the imbalances between the participant's actual gas consumption and its nomination on the [Williams] pipeline are allocated by the receiving party to each participant.

"f.  The bypass pipeline and lateral pipelines are not directly connected to another natural gas distribution plant or facility. The lateral pipelines have no functional value except as connected or related to the bypass pipeline.

"g.  The condominium bypass distribution system is located within [Northwest's] allocated territory and

in an area served by distribution facilities owned and operated by [Northwest]."

The essential aspect of the arrangement that Northwest describes is that two or more independent industrial consumers receive natural gas through the same direct connection to the Williams pipeline.[1] They do so through a single bypass pipeline that connects with the Williams pipeline at a single location. Two or more lateral pipelines connect with the bypass pipeline, at some distance from its connection with the Williams pipeline. Each lateral pipeline serves a different industrial consumer. The consumers share in the ownership and costs of the bypass pipeline, and each consumer pays for the gas that it uses. One or more of the participants keeps track of individual gas use and allocates the costs involved among the participating parties. The arrangement requires operational and accountability policies and central management. The fundamental issue in this case is whether such a multi-user direct connection with the Williams pipeline is consistent with Northwest's exclusive right to provide utility service to the same geographical area.

Northwest argued to the PUC that this arrangement violates the Territorial Allocation Law, ORS 758.400 to 758.475, because it permits industrial consumers to receive utility service from connections to the mutually owned bypass pipeline rather than from Northwest. ORS 758.410 and ORS 758.440 authorize the PUC to allocate the exclusive right to serve a particular territory to a public utility. ORS 758.450(2) provides that, once the PUC does so, "[e]xcept as provided in subsection (4) of this section, no other person shall offer, construct or extend utility service in or into an allocated territory."[2] ORS 758.400 defines two of the crucial terms in that prohibition. First, ORS 758.400(2) defines "person" as including "individuals, firms, partnerships, corporations, associations, cooperatives and municipalities, or their

---

[1] The PUC found that it was likely that the owner of one of the bypass pipelines would offer service on these conditions to five other nearby industrial customers of Northwest.

[2] ORS 758.450(4) establishes four exceptions to the prohibition, none of which applies to this case.

agent, lessee, trustee or referee." Secondly, ORS 758.400(3) defines "utility service" to mean:

> "service provided by any equipment, plant or facility for the distribution of electricity to users or the distribution of natural or manufactured gas to consumers through a connected and interrelated distribution system. 'Utility service' does not include service provided through or by the use of any equipment, plant or facilities for the production or transmission of electricity or gas which pass through or over but are not used to provide service in or do not terminate in an area allocated to another person providing a similar utility service."

Northwest argued to the PUC that a condominium bypass distribution system provides utility service under the statutory definition and that the two or more industrial consumers who jointly own and operate it are a "person" within the meaning of ORS 758.400(2). As a result, according to Northwest, the bypass system violates the statutory prohibition on any person providing utility service in territory allocated to Northwest. The PUC rejected that argument.

The PUC issued its first order in the case on June 9, 2000. In that order, it began by noting that the parties agreed that a single consumer could construct a bypass pipeline for its sole use without violating Northwest's exclusive right to provide utility service. The PUC then described the arrangement in this case as simply involving a number of single consumers working jointly:

> "Under the Assumed Facts, the participants in a so-called condominium bypass system are co-owners of part of the facilities involved and may be sole owners of other parts. The co-owners are not employed by each other, but are operating to provide service to themselves through a mutually beneficial arrangement. They do not sell utility product or service to each other. They are not offering service of any sort to the general public. The facilities they have created do not benefit or serve anybody but themselves. The fact that they may appoint one of the co-owners as the receiving party or that one of the co-owners may perform management duties does not change the fact that the arrangement is one involving co-owners and not a utility and its customers. Each of the co-owners is, in fact, a sole

customer who happens to have arranged for service to itself through an arrangement with another coequal customer."

The PUC therefore concluded that the arrangement did not violate the purposes of ORS 758.405 because it did not constitute the wasteful duplication of utility facilities. It explained, "The statute is aimed at preventing wasteful duplication of facilities used by utilities, not at preventing duplication of facilities that customers may use to provide service to themselves."

■   On Northwest's motion, the PUC reconsidered its first order and issued an order on reconsideration on August 9, 2001. In that order, it discussed the relevant statutes in more detail.[3] It began by stating that there are four elements to prove a violation of ORS 758.450: (1) the entity must be a "person" or "persons" as defined in ORS 758.400(2); (2) the arrangement must involve "utility service" as defined in ORS 758.400(3); (3) the utility service must be in an allocated territory; and (4) none of the exemptions in ORS 758.450(4) can apply. The PUC explained that, in its original order, it determined that the arrangement did not involve utility service, and, therefore, it did not consider any of the other factors. After discussing a number of Northwest's objections to the original order, the PUC discussed the relevant statutes, emphasizing again that its opinion focused exclusively on whether the arrangements involved "utility service." It explained,

"We do not agree with [Northwest's] textual or contextual analyses. They do not, in our view, properly consider the statutory context of the territorial allocation law as a whole. We conclude that our analysis of text and context is more thoroughgoing and objective. We reiterate it here.

"First, the key terms in ORS 758.400 and 758.450 are not 'clear' on their face, as [Northwest] argues. Several of them are general terms which have several meanings, depending on the situation: 'utility,' 'service,' 'distribution,' 'system,' 'facilities,' interrelated,' and others. Mere reference to a dictionary to determine their meaning, as

---

[3] Because the PUC treated its order on reconsideration as explaining its original order rather than modifying or replacing it, we treat both orders as together expressing the PUC's decision and the reasons for it.

[Northwest] proposes, although potentially useful, will not necessarily provide a sound answer. For example, the Company uses a dictionary definition of 'interrelated' (having a 'mutual or reciprocal relation or parallelism') to conclude that the system in the Assumed Facts is interrelated because 'the, lateral pipelines have no functional value except as connected or related to the bypass pipeline and individual plant meters are used to apportion consumption with the system.' We do not find this argument responsive to the issues in the case. To avoid an arbitrary conclusion as to the meaning of these terms, it is absolutely necessary to refer to their context to determine legislative intent.

"Context for interpreting a statute, as the Court states in *PGE v. BOLI*, [317 Or 606, 859 P2d 1143 (1993)] is provided by the entirety of the statute in question and by related statutes. In this case, the statutes in question, ORS 758.400 and 758.450, are part of a distinct and unified set of statutes relating to territorial allocation (ORS 758.400 through 758.475; called 'territorial allocation law' herein). That coherent structure gives us an explicit framework for our contextual analysis. Any conclusion we arrive at as to the specific statutes in question must be consistent with the function and purposes of the territorial allocation law. Moreover, some of the key terms at issue in this case, such as those referred to above, are used in more than one place in the territorial allocation law. Since it is reasonable to assume (absent legislative direction otherwise) that the meaning intended for a term is consistent throughout a discrete set of statutes, any meaning adopted for a term used in the key statutes must not result in incongruous results when applied in other portions of that statutory scheme.

"The territorial allocation law sets out a process by which allocation of territory and customers may be carried out in an orderly fashion. In ORS 758.400, the statute providing definitions for the remainder of the territorial allocation law, 'allocated territory' is an area established by contract approved by the Commission between persons providing a similar 'utility service' or established by order of the Commission approving an application for the allocation of territory. Other portions of the territorial allocation law then set out the process by which the allocation occurs: how amendments may be effected, how contracts may be enforced, and the import of the allocation, among other related matters. The 'purpose' statute, ORS 758.405,

explains the goals of this comprehensive scheme: to avoid duplication of utility facilities; to promote efficient, economic, and safe utility service; and to provide adequate and reasonable service 'to all territories and customers.' This provision concludes that to achieve these purposes, it is necessary to 'regulate' all persons and entities providing utility service as provided in the territorial allocation law.

"Thus, the territorial allocation law, as reflected in the structure of the law and the explicit purposes noted, allows the commission to decide two of the paramount issues it must deal with: who serves what area and which customers. We recognized that goal in Order No. 92-557, where we noted that the territorial allocation law was created to address the duplication of services by PP&L and PGE in Portland (at 2). We noted that the territorial allocation statutes:

" '. . . establish two ways in which the commission may approve exclusive service territory allocations. ORS 758.410 to 758.425 establish the first method: a utility and its neighboring utility may agree to a mutual service territory boundary and execute a contract allocating territories and customers between them . . . ORS 758.435 to 758.440 establish the second method: if a utility is the exclusive provider of utility service in an area, the utility may unilaterally file an application with the commission to obtain exclusive service territory (at 3).'

"We see nothing in this statutory scheme that indicates it was designed to allow, or require, the commission to prevent consumers from arranging for service to themselves. That is what [Northwest] is asking us to do in this case, however, it couches its position. As we said in Order No. 00-306:

" 'Under the Assumed Facts, the participants in a so-called condominium bypass system are co-owners of part of the facilities involved and may be sole owners of other parts. The co-owners are not employed by each other, but are operating to provide service to themselves through a mutually beneficial arrangement. They do not sell utility product or service to each other. They are not offering service of any sort to the general public. The facilities they have created do not benefit or serve anybody but themselves. The fact that they may appoint one

of the co-owners as the receiving party or that one of the co-owners may perform management duties does not change the fact that the arrangement is one involving co-owners and not a utility and its customers. Each of the co-owners is, in fact, a sole customer who happens to have arranged for service to itself through an arrangement with another coequal customer.' "

The most significant aspect of the PUC's explanation is its failure to recognize the ordinary meaning of the words that the legislature used in ORS 758.400(2). Rather, it appears to have relied entirely on its understanding of the purposes for the Territorial Allocation Law as the basis for its interpretation of who constitutes a "person" under the statute. While, in general, the purpose underlying a statute constitutes important context for determining what the legislature intended a statute to mean, agencies and courts are without authority to put policy considerations into the meaning of statutes in place of the words that the legislature has chosen to use.

> "Statutes and rules often contain statements of general policy * * *. Such expressions *can* serve as contextual guides to the meaning of particular provisions of the statutes or rules, as much as any other parts of the enactment can. At the same time, the use of expressions of policy as context is subject to the same limitations as any other proffered type of context: *they are instructive only insofar as they have a genuine bearing on the meaning of the provision that is being construed.* Moreover, when legislative or administrative expressions of policy are offered as context, courts must be cautious not to *make* policy in the guise of interpretation, or to allow agencies or other parties to achieve through a court's interpretation policy objectives that the enactment as promulgated was not meant to or failed to embody."

*DLCD v. Jackson County*, 151 Or App 210, 218, 948 P2d 731 (1997), *rev den*, 327 Or 620 (1998) (first and third emphases in original; second emphasis added); *see also* ORS 174.010. Although we may give some weight to an agency's construction of inexact terms in statutes that the agency is charged with enforcing, *see Coast Security Mortgage Corp. v. Real Estate Agency*, 331 Or 348, 354, 15 P3d 29 (2000), here, the

PUC did not analyze the meaning of the crucial statutory language. That is something that we must do as part of determining whether the PUC's order is unreasonable or unlawful. *See* ORS 756.594.

In its reasoning, the PUC implicitly decided that the joint ownership of the bypass pipeline involved in the condominium bypass system did not constitute a separate entity or "person" for purposes of ORS 758.400(2). Rather, it described those interests as belonging to co-owners who were "operating to provide services to themselves through a mutually beneficial arrangement." As a result, it stated that each co-owner "is, in fact, a sole customer who happens to have arranged for service to itself through an arrangement with another coequal customer." That conclusion led it to find no significant difference between the system that Northwest described and an individual business that connected directly to the Williams pipeline, something that all parties agree is permissible under the Territorial Allocation Law.

The problem with the PUC's analysis is that it does not engage with the language of ORS 758.400(2), which provides that cooperatives and associations are discrete "persons" within the meaning of the act. Even assuming that the statute's meaning is limited to cooperatives that are incorporated under ORS chapter 62, the arrangement among users that the record describes is an "association" within the commonly understood meaning of the word. It is therefore an entity separate from the individual users who use the bypass pipeline in conjunction with their individual lateral pipelines to receive gas. The relevant definition in *Webster's* is: "a body of persons organized for the prosecution of some purpose, having no charter from the state but having the general form and mode of procedure of a corporation." *Webster's Third New Int'l Dictionary* 133 (unabridged ed 1993). A condominium bypass distribution system, as described by the record in this case, is an arrangement that requires that separate entities join together to create a different entity, which owns the bypass pipeline and jointly administers it, appointing one or more of its members for that purpose. Those circumstances satisfy the ordinary definition of the meaning of the word

"association" because the participants in the system constitute a body of persons organized for the prosecution of a particular purpose. Thus, by statutory definition, the control of the bypass pipeline lies with an "association," which for the purposes of the Territorial Allocation Law is a "person" discrete from the business entities that make up the association. Contrary to the PUC's reasoning, for a number of business entities to join together to obtain a supply of gas is not the same as each one obtaining services individually, and the PUC ignored the meaning of the words that the legislature used when it interpreted the statute to the contrary.[4]

The PUC also erred in its explicit determination that a condominium bypass distribution system does not involve the provision of utility service and thus does not violate Northwest's right, under ORS 758.450(2) and the PUC's allocation order, to be the exclusive provider of natural gas utility service in the area. ORS 758.400(3) defines "utility service" as meaning "service provided by any equipment, plant or facility for the distribution of electricity to users or the distribution of natural or manufactured gas to consumers through a connected and interrelated distribution system." The focus of the definition in the statute is on the use of facilities to distribute natural gas to those who use it, that is, "consumers." It is the physical act of distribution to more than one user of electricity or more than one consumer of natural gas that constitutes utility service; the contractual or other relationship between the entity that provides the electricity or gas and the entity that uses or consumes it is irrelevant under the statutory definition. Thus, unlike other portions of the territorial allocation law, *see, e.g.*, ORS 758.410, the definition of "utility service" does not refer to the "customers" of a utility but to the "users" or "consumers" of the product.[5]

---

[4] Because of our conclusion, we do not need to consider whether the co-owners constitute a *de facto* partnership or joint venture.

[5] The PUC and intervenors argue that the legislature used "consumers" and "customer" interchangeably in the Territorial Allocation Law. That argument ignores, among other things, the statutory reference to "users" of electricity. It appears that the legislature carefully distinguished between "users" of electricity and "consumers" of natural gas, on the one hand, and "customers" of a utility on the other. Although all customers of a utility are necessarily users or consumers of the utility's product, the opposite is not true.

In sum, the fundamental problem with the PUC's analysis is that it fails to apply correctly the statutory definitions that establish the contours of who is a person subject to the act and what services are subject to it.[6] Because of the statutory definitions, it does not matter under the act that the facilities are co-owned by the consumers of the gas or that the owners do not offer service to the general public. It also does not matter that they operate jointly and are not customers of each other. What does matter is that the business entities involved do not each connect independently to the Williams pipeline but, rather, jointly operate a system as a separate entity, an entity that has a common connection to the pipeline.

The trial court did not accept the PUC's statutory analysis but affirmed its decision on the ground that the system was not sufficiently complex to be "connected and interrelated" under the statutory definition of "utility service." However, the court's role on judicial review is to determine whether the order is "unreasonable or unlawful," ORS 756.594, and, in case of modification or reversal, to indicate the respects in which the order is erroneous, ORS 756.598(2). It is not a court's task to create a basis for the PUC's ultimate conclusion that is different from the basis that the PUC itself expressed. Rather, it is for the PUC on remand to reconsider the issues involved.

In their briefs, the parties discuss whether the bypass and lateral pipelines constitute a connected and interrelated system. Intervenors essentially adopt the trial court's approach, while Northwest suggests that a system that serves only a few consumers will necessarily be less complex than one that serves many but will still satisfy the statutory definition. It points out that ORS 758.450(4)(b) exempts utilities that serve fewer than 20 residential customers and no industrial customers from the restrictions of the Territorial Allocation Law and argues that that exemption suggests that the legislature intended relatively simple systems that serve

---

[6] Although the PUC states that a number of statutory words are general terms with several meanings, it does not attempt to analyze how the words and their various possible meanings relate to each other in the context of the statute as a whole. Rather, in its decision it relies on the policy issues that it discusses in the guise of considering the statutory context.

industrial customers to come within the statutory prohibition. Those are issues for the PUC to consider on remand in light of the controlling statutory definitions.

Reversed and remanded with instructions to remand to the PUC for reconsideration.