Argued and submitted September 21, 2004, OAR 410-121-0030 held valid
April 20, petition for review denied August 9, petition for review denied
August 9, 2005 (339 Or 156)

PURDUE PHARMA, L.P.;
and the Purdue Frederick Company,
*Petitioners,*

*v.*

OREGON DEPARTMENT OF HUMAN SERVICES,
acting by and through the Office of
Medical Assistance Programs,
*Respondent.*

A119392

110 P3d 657

James N. Gardner argued the cause for petitioners. With him on the briefs were Lynda N. Gardner and Gardner & Gardner, Attorneys, P.C.

Jennifer S. Lloyd, Assistant Solicitor General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Armstrong, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

Petitioners Purdue Pharma, L.P., and the Purdue Frederick Company seek judicial review pursuant to ORS 183.400 of an amended Department of Human Services (DHS) administrative rule that lists drugs that are approved for reimbursement by the state for clients of the Oregon Health Plan. Petitioners contend that the amended rule was adopted without compliance with applicable rulemaking procedures and exceeded the statutory authority of DHS. We conclude that DHS complied with applicable procedures and did not exceed its authority in adopting the amended rule and therefore uphold its validity.

## I. BACKGROUND

A. *The regulatory context*

Because this case concerns a regulatory process that is relatively complex and involves more than the usual dose of acronyms and initialisms, we begin with a description of the relevant statutes and administrative rules. In 2001, the legislature enacted legislation adding a "Practitioner-Managed Prescription Drug Plan" (PMPDP) to the Oregon Health Plan. Or Laws 2001, ch 897, §§ 1-3. That legislation begins with a set of findings concerning prescription drugs:

"(1) The cost of prescription drugs in the Oregon Health Plan is growing and will soon be unsustainable;

"(2) The benefit of prescription drugs when appropriately used decreases the need for other expensive treatments and improves the health of Oregonians; and

"(3) Providing the most effective drugs in the most cost-effective manner will benefit both patients and taxpayers."

ORS 414.330.

The legislation then declares that it is the policy of the State of Oregon that a PMPDP will ensure that

"(1) Oregonians have access to the most effective prescription drugs appropriate for their clinical conditions;

"(2)   Decisions concerning the clinical effectiveness of prescription drugs are made by licensed health practitioners, are informed by the latest peer-reviewed research and consider the health condition of a patient or characteristics of a patient, including the patient's gender, race or ethnicity; and

"(3)   The cost of prescription drugs in the Oregon Health Plan is managed through market competition among pharmaceutical manufacturers by publicly considering, first, the effectiveness of a given drug and, second, its relative cost."

ORS 414.332.

To implement that policy, the legislation directs DHS to adopt a PMPDP for the Oregon Health Plan "to ensure that enrollees of the Oregon Health Plan receive the most effective prescription drug available at the best possible price." ORS 414.334(1). The legislation requires DHS to conduct public meetings and to consult with the Health Resources Commission (HRC) and with representatives of regulatory boards and associations that represent practitioners who would prescribe the drugs. ORS 414.334(2), (3).

In response to the legislation, DHS adopted an administrative rule establishing procedures for determining which prescription drugs to include on the PMPDP "Plan Drug List" (PDL). OAR 410-121-0030(2) (2003). According to that rule, the PDL consists of "prescription drugs for selected classes that DHS, in consultation with the Health Resources Commission (HRC), has determined represent[ ] effective drug(s) available at the best possible price[.]" OAR 410-121-0030(2)(b) (2003). For each selected drug class, the PDL is supposed to "identify a drug(s) as the benchmark drug that has been determined to be the most effective drug(s) available for the best possible price[.]" OAR 410-121-0030(2)(c) (2003).

The rule describes the process by which DHS selects prescription drugs for inclusion on the PDL:

"(a)   DHS will utilize the recommendations made by the HRC, which result from an evidence-based evaluation process, as the basis for identifying the most effective drug(s) within a selected drug class;

"(b)   DHS will determine the drug(s) identified in (3)(a) that is available for the best possible price; and considering any input from the HRC, other FDA approved drug(s) in the same class that are available for a lesser relative price."

OAR 410-121-0030(3) (2003).

Included in the process is a method of calculating the relative costs of drugs:

"(a)   DHS will determine the relative cost of all drugs in each selected class that are Medicaid reimbursable and that the FDA has determined to be safe and effective;

"(b)   DHS will first determine the benchmark drug based on the Average Wholesale Price (AWP) on the first of the month in which DHS reviews that specific drug class;

"(c)   Once the cost of the benchmark drug is determined, the costs of other FDA approved drugs in the class will be recalculated using AWP, Oregon Maximum Allowable Cost (OMAC) and/or Federal Upper Limits in effect on the first of the month in which DHS reviews that specific drug class * * * less average rebate. Drugs with prices under 105% of the benchmark drug price will be included on the [PDL];

"(d)   DHS will consider price, rebate, and the stability of both over a period of time in determining the cost effectiveness. DHS may also consider dosing issues, patterns of use and compliance issues. These factors will be weighed with any advice provided by the Health Resources Commission in reaching a final decision."

OAR 410-121-0030(4) (2003).

The list itself is published as a table appended to the administrative rule. Table 121-0030-1.

B.   *Adoption of the challenged amended rule*

In September 2001, HRC began the drug evaluation process. Early the following year, HRC appointed a subcommittee consisting of physicians, pharmacists, and other health care professionals to perform a review of a particular class of drugs—long-acting opioid analgesics used for non-cancer pain. After several months of study, the subcommittee concluded:

"[T]here is insufficient evidence to draw any conclusions about the comparative effectiveness of long-acting opioid [analgesics]. There is also insufficient evidence to draw conclusions about incidence and nature of adverse effects, including discontinuation rates and addiction and abuse of long-acting opioid [analgesics]. No evidence supports differences in efficacy or adverse effects in sub-populations by race and ethnicity, age, gender, or type of pain in this class of drugs."

Meanwhile, in June 2002, then-Governor John Kitzhaber sent a letter to medical practitioners throughout the state.[1] The letter described the PMPDP legislation and described the process by which DHS would develop the PDL. The letter also stated:

"The HRC reported its findings on the effectiveness of [long-acting opioid analgesics] to the Department of Human Services, which in turn has evaluated their cost.

"Upon adoption of the appropriate administrative rule, this combined analysis will result in the following drugs being selected as the PMPDP plan drugs * * *:

"* * * * *

"**Long acting [opioid] analgesics—LA-Morphine Sulfate (generic, Kadian, Oramorph SR), Methadone (generic, Methadose, Dolophine), Levorphanol (generic, Levo-Dromoran), Transdermal Fentanyl (Duragesic). Short acting analgesics are not affected by this process.**"

(Boldface in original.) He also encouraged practitioners to attend future educational presentations concerning the PMPDP and the development of the PDL.

Later that same month, DHS issued a notice of proposed rulemaking concerning an amendment to OAR 410-121-0030 consisting of a list of long-acting opioid analgesics as part of the PDL. The list contained the same analgesics that were mentioned in the Kitzhaber letter. On August 1, 2002, DHS adopted the amended rule as proposed.

---

[1] The letter is not part of the record. The parties, however, have stipulated that we may take judicial notice of it and its contents.

## II. DISPOSITION OF PETITIONERS' CHALLENGE TO AMENDED RULE

Petitioners are the manufacturers of two long-acting opioid analgesics that DHS evaluated but ultimately did not include in the PDL. Pursuant to ORS 183.400, they challenge the validity of the amended rule insofar as it lists various long-acting opioid analgesics, but does not include their products. They argue that the rule is invalid for four different reasons: (1) DHS failed to follow applicable rulemaking procedures as set out in the Administrative Procedures Act (APA), as shown by the Kitzhaber letter, which demonstrates that the agency had already decided to adopt the PDL before it had even issued its notice of proposed rulemaking; (2) DHS failed to comply with both the statute and the PMPDP rule when it adopted the amendment to the PDL without first determining the relative effectiveness of long-acting opioid analgesics; (3) the amended rule fails to limit its application to analgesics used for noncancer pain; and (4) DHS failed adequately to consider the relative costs of the drugs on the list. We address each of petitioners' arguments in turn.

### A. *Failure to comply with APA*

■       Petitioners' first argument is that the sequence of events that we have described

> "reveals that the notice and public hearing on the proposed rule amendment was an elaborate sham, sanctioned at the highest level of state government, and that the exact content of the rule amendment had been decided in secret well in advance of the rule amendment notice and public hearing."

In support of that rather strong statement, petitioners rely on the Kitzhaber letter that was sent to practitioners around the state shortly before DHS issued the notice of proposed rulemaking. According to petitioners, the facts that the Kitzhaber letter preceded the notice of proposed rulemaking—and that the letter predicted precisely which long-acting opioid analgesics would be included in the PDL—show that DHS violated ORS 183.335, which, among other things, requires advance notice of the proposed rule amendments and a reasonable opportunity to submit information to an

agency in advance of the adoption of the amendment. In this case, petitioners argue, it is clear that, even before the notice of proposed rulemaking, DHS already had made its decision. DHS responds that petitioners apparently do not understand how the administrative rulemaking process works. According to DHS, under the APA, there is no requirement that the agency be free of any disposition to adopt a proposed rule before it is proposed. We agree with DHS.

Our review of the validity of an administrative rule under ORS 183.400 is limited to determining, as a matter of law, whether the rule violates a provision of the constitution, exceeds the statutory authority delegated to the agency promulgating the rule, or was "adopted without compliance with applicable rulemaking procedures." ORS 183.400(4); *Planned Parenthood Assn. v. Dept. of Human Res.*, 297 Or 562, 565, 687 P2d 785 (1984). In this case, petitioners contend that DHS adopted the PDL without compliance with ORS 183.335, in particular, subsections (1) and (3).

The first of those two subsections requires that, before adopting a rule or an amendment to a rule, an agency must give "notice of its intended action." ORS 183.335(1). The notice must "provide[ ] a reasonable opportunity for interested persons to be notified of the agency's proposed action." ORS 183.335(1)(a). It also must be published in the Oregon Bulletin at least 21 days before the effective date of the proposed rule or rule amendment. ORS 183.335(1)(b). The agency also must provide earlier notice to certain members of the legislature and to persons who have requested such special notice. ORS 183.335(1)(c), (d). The agency's notice must state the subject and purpose of the proposed rule or rule amendment "in sufficient detail to inform a person that the person's interests may be affected, and the time, place and manner in which interested persons may present their views on the intended action." ORS 183.335(2).

The second of the two subsections requires that agencies proposing to adopt or amend a rule "give interested persons reasonable opportunity to submit data or views." ORS 183.335(3). Among other things, the agency must provide an opportunity for hearings and to submit oral or written comments. ORS 183.335(3)(a). The agency must also "consider fully" those submissions. *Id.*

In this case, it is undisputed that DHS timely sent the required notice of proposed rulemaking and that the notice contained the required information. Moreover, there is no dispute about the sufficiency of the notice to inform petitioners about the subject and purpose of the proposed rule amendment. And there is no contention that the agency did not provide an opportunity to submit written or oral comments on the proposed rule amendment. In short, the record demonstrates that DHS fully complied with ORS 183.335 in all relevant respects.

Petitioners nevertheless suggest that implicit in the foregoing statutes is an additional requirement that the agency have no predisposition to adopt its proposed rule before considering the comments that are submitted on it. There is, however, no such requirement expressed in the statute or implicit in its provisions. To the contrary, the APA repeatedly states that the agency must provide notice of its *intended* action." ORS 183.335(1), (2)(a), (2)(b), (2)(d) (emphasis added). The agency is obligated to "consider fully" any comments that may be submitted, as we have noted. But the mere fact that a governor or an agency has expressed a view about a proposed rule or rule amendment in advance of its adoption does not, by itself, demonstrate that the agency did not satisfy its obligation to fully consider any comments that it later received. We reject petitioners' argument without further discussion.

B. *Failure to determine relative effectiveness of drugs*

Petitioners next argue that the PDL is invalid because DHS developed its list of analgesics without first determining which of them was the "most effective." Petitioners place special emphasis on HRC's conclusion that "there is insufficient evidence to draw any conclusions about the comparative effectiveness of long-acting opioid [analgesics]." According to petitioners, because none of the drugs could be considered more effective than others, there was "no basis whatsoever for selecting drugs within this therapeutic class" for the PDL. Petitioners draw support for their argument from the statement of policy that appears at ORS 414.332(3), which declares that DHS should consider "first, the effectiveness of a given drug and, second, its relative cost." Petitioners

argue that the policy creates, in effect, a sequential, two-step process. Without satisfying the first step, they argue, DHS could not proceed to the second.

DHS replies that there simply is no such statutory or regulatory condition for creating the list of drugs. According to DHS, the statement of policy that appears at ORS 414.332 is just that—a statement of policy. Moreover, DHS argues, the statute does not set up a *sequential*, two-step process, as petitioners suggest. It simply requires that DHS consider both effectiveness and cost, which is precisely what the agency did. Again, we agree with DHS.

As we have noted, ORS 414.332 consists of what the statute itself describes as a "policy." Subsection (3) declares that part of that policy is that "[t]he cost of prescription drugs in the Oregon Health Plan is managed through market competition among pharmaceutical manufacturers by publicly considering, first, the effectiveness of a given drug and, second, its relative cost." ORS 414.332(3).

To begin with, as DHS observes, that is a statement of policy, which, by its terms, imposes no requirement that the agency do anything. *See Northwest Natural Gas Co. v. PUC*, 195 Or App 547, 556, 99 P3d 292 (2004) (statutory statements of policy may serve as useful context for a statute, but courts should be cautious about reading more into them); *School Dist. No. 1 v. Teachers' Retirement*, 30 Or App 747, 752, 567 P2d 1080 (1977), *rev den*, 281 Or 1 (1978) ("hortatory" phrasing of statutory purpose "does not appear to mandate anything that is justiciable"). Even to the extent that the statute could be read to establish some sort of mandate, at best, that mandate consists of "publicly considering" two things: the effectiveness of a given drug and its cost.

Petitioners insist that the use of the terms "first" and "second" requires the two considerations to be evaluated in sequence, with cost considerations being permitted only if it is determined that some drugs are more effective than others. Petitioners' conclusion does not necessarily follow from its premise, however. Even assuming for the sake of argument that, by using the ordinals "first" and "second," the legislature intended to require such a sequence, the fact remains that DHS performed the sequence. The first step is

to "publicly consider[ ] * * * the effectiveness of a given drug * * *." ORS 414.332(3). Plainly, the statute requires consideration of drug "effectiveness." It does not require that DHS determine that some drugs are *more* effective than others. In this case, the record shows that HRC considered in some depth the effectiveness of various long-acting opioid analgesics. That it ultimately concluded that all were of equal effectiveness does not mean that effectiveness was not carefully considered.

Petitioners suggest that a requirement that there be a determination of *relative* effectiveness of drugs can be inferred from the rule itself, which provides that "DHS will utilize the recommendations made by the HRC, which result from an evidence-based evaluation process, as the basis for identifying the *most effective* drug(s) within a selected drug class[.]" OAR 410-121-0030(3)(a) (2003) (emphasis added).

■ Petitioners' reading of the rule is plausible, we agree. That fact, however, obtains petitioners nothing. Under *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994), we are required to defer to an agency's interpretation of its own administrative rule so long as it is not inconsistent with the text of the rule, the organic statute, or any other source of law. In this case, DHS relies on the phrasing of the rule—which refers to an obligation to identify the most effective "drug(s)," in the plural—for its interpretation that the agency is permitted to determine that any number of drugs may be most effective. Nothing in the wording of the rule, the agency argues, requires it to rank drugs that are actually of equal effectiveness.

We agree with DHS that its interpretation is at least plausible and does not conflict with the language of the rule, the statute, or any other source of law. Under *Don't Waste Oregon*, that is dispositive.

C. *Failure to state that the PDL does not apply to treatment of cancer pain*

■ Petitioners next contend that the PDL is invalid because it fails to state expressly that it does not apply to drugs used for treating cancer pain. Petitioners rely on ORS 414.325(6), which provides that "the department may not

limit legend drugs when used as approved by the federal Food and Drug Administration to treat mental illness, HIV and AIDS, and cancer." Petitioners interpret that statute to create, in effect, a "carve-out" of drugs used for such treatments from the PMPDP.

DHS responds that petitioners are merely speculating that, in the absence of an express disclaimer that the PDL does not apply to drugs used to treat cancer pain, the list *could be* applied in a manner that violates the law. That, DHS contends, amounts to an impermissible as-applied challenge. We agree with DHS.

Judicial review under ORS 183.400 is limited. Except for procedural issues not involved in this case, we review a challenged rule "only to determine whether those rules on their face comply with applicable constitutional and statutory requirements. If the rules comply, then any further challenge to them must be made on an 'as applied' basis" in another forum. *Oregon Newspaper Publishers v. Dept. of Corrections*, 329 Or 115, 118-19, 988 P2d 359 (1999). In this case, petitioners' contention that the PDL *might be* applied in a manner contrary to ORS 414.325(6) is an as-applied challenge. We reject the argument without further discussion.

D. *Failure to consider publicly relative costs*

■ Finally, petitioners argue that DHS failed to "publicly consider" the relative costs of the drugs listed in the PDL. Relying again on the statement of policy in ORS 414.332(3), petitioners complain that the agency failed to show its actual calculations in performing the cost evaluation process described in OAR 410-121-0030(4). DHS again replies that ORS 414.332(3) does not impose such an obligation. In any event, DHS argues, the record contains ample evidence of how the calculations were performed, and that information was made available to the public. We agree with DHS.

At the outset, we reiterate that it is not at all clear that the statement of policy in ORS 414.332(3) on which petitioners rely imposes a mandate on DHS to do anything in

particular. That aside, however, DHS is correct that the record shows that it followed the method described in the applicable administrative rule for calculating the relative costs of the various drugs under consideration. Moreover, it is clear from the record that DHS made the adjusted comparative costs of the drugs on the PDL and the HRC discussions regarding the cost analysis available to the public for consideration and comment. We conclude that DHS complied with an obligation to "publicly consider" relative costs, assuming that such an obligation exists.

In sum, we reject each of petitioners' challenges to the validity of the amended rule and declare that it is valid.

OAR 410-121-0030 held valid.