Argued and submitted December 20, 2007, reversed and remanded June 18, 2008

# DeLEON, INC.,
## *Petitioner,*

*v.*

# DEPARTMENT OF HUMAN SERVICES,
## *Respondent.*

## Department of Human Services
## A132259

188 P3d 354

Jack Oswald argued the cause and filed the briefs for petitioner.

Michael C. Livingston, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

**SCHUMAN, J.**

The Department of Human Services (DHS) penalized petitioner DeLeon, Inc., the owner and operator of a grocery store, for violating rules governing the federally sponsored Women, Infants, and Children (WIC) Program. Petitioner seeks judicial review, arguing that DHS incorrectly construed and applied the rules. We agree with petitioner. We therefore reverse and remand.

The WIC Program provides nutrition education and counseling, nutritious supplemental foods, and health screening and referral services for infants, children in certain high-risk categories, and pregnant and breast-feeding women. ORS 409.600; OAR 333-054-0000(1).[1] As relevant to this case, the program provides participants with "food instruments," which are vouchers on which a specific quantity of a particular authorized product is listed (for example, "Five cans 12.9 oz. Enfamil Lipil with Iron Powder"). *See* OAR 333-054-0010(13) (defining "food instruments"). The participant typically takes the voucher to a store that is an authorized vendor and uses it to "pay for" the listed product; the shopper signs the voucher and gives it to the store cashier instead of money, a check, or a credit card. The store, in turn, fills in a box on the voucher specifying how much the product would have cost a non-WIC shopper, sends the voucher to DHS, and receives reimbursement.

Federal rules require that, in order to continue receiving federal funds to participate in the program, a state must adopt and implement standards and procedures of administration. 7 CFR Part 246; OAR 333-054-0000(2). One such procedure is mandatory monitoring of WIC vendors by the state through "compliance buys," that is, "covert, on-site investigation[s] in which a representative of the [state] Program poses as a participant, parent or caretaker of an infant or child participant, or proxy, transacts one or more food instruments, and does not reveal during the visit that he or she is a program representative." 7 CFR § 246.2.

---

[1] Citations throughout are to Oregon Administrative Rules promulgated January 5, 2004, in effect at all times relevant to this case. The rules have since been renumbered and, in some cases, amended.

The WIC Program in Oregon is administered by DHS. OAR 333-054-0000(3). Under ORS 409.600(2), DHS is required to adopt "[s]tandards and procedures to guide administration of the [WIC P]rogram by the state in conformity with federal requirements and to define the rights, responsibilities, and legal procedures of program vendors." Accordingly, DHS has promulgated rules, violations of which are classified as Type 1, 2, or 3, based on severity. OAR 333-054-0050. As required by federal law, the agency has also adopted rules for "compliance buys." OAR 333-054-0010(8).

In the present case, petitioner seeks review of DHS's order finding two Type 3 violations, the penalty for each of which, if upheld, is petitioner's disqualification as a WIC provider for a period of three years. Each violation, in turn, involves a "pattern" of offenses, that is, "three or more of the same rule violation that occurs within a single investigation." OAR 333-054-0010(18). DHS charged petitioner with, first, engaging in a "pattern of vendor overcharges." OAR 333-054-0050(3)(b)(C). A "vendor overcharge" occurs when a vendor "intentionally or unintentionally charg[es] DHS more for authorized foods than the actual shelf price or the price they charge other shoppers." OAR 333-054-0010(28). Second, DHS charged petitioner with "a pattern of charging for authorized foods not received by the authorized shopper." OAR 333-054-0050(3)(b)(E). "Authorized food[s]" are "any supplemental foods listed on the WIC Authorized Food List or the food instrument," OAR 333-054-0010(4), and an "authorized shopper" is a "participant or any person designated by a participant who has been documented as such at the local agency to act on the participant's behalf and, in the case of an infant or child, the caretaker or the caretaker's designee." OAR 333-054-0010(5). OAR 333-054-0010(17) defines "participant" as "any pregnant woman, breastfeeding woman, post-partum woman, infant or child who receives authorized foods or food instruments under the WIC Program, and the breast-fed infant of any participating breastfeeding woman."

In sum, according to DHS, on three occasions, petitioner sought reimbursement from DHS for the sale of an authorized food, in an amount greater than the shelf price of

that food; and, on three occasions, petitioner sought reimbursement from DHS for an authorized food not received by the authorized shopper.

Petitioner does not dispute DHS's account of the events leading to the charges. Petitioner entered into a vendor agreement with DHS on September 25, 2002, under which petitioner was authorized to sell food items in return for Oregon WIC food instruments. In the vendor agreement, petitioner agreed to "write the actual purchase price in the designated box on the food instrument before the authorized shopper signs the food instrument." The agreement also provided, "The vendor shall be accountable for any intentional or unintentional action of its owners, officers, managers, employees or agents, with or without the knowledge of management, who violate the vendor agreement or federal or state statutes, regulations, policies or procedures governing the Program."

Sorenson is a DHS employee whose job duties include posing as an authorized shopper to conduct "compliance buys" as required under OAR 333-054-0010(8). Sorenson is not a participant in the program, a designee of such a participant, or the caretaker of an infant or child who is a participant; in other words, he is not an "authorized shopper."

On July 1, 2005, Sorenson purchased from petitioner two cans of Similac, an infant formula, presenting a food instrument authorizing purchase of up to five cans of Enfamil, also an infant formula. Similac is not an authorized food; Enfamil is. Although the listed price of Similac was $12.99 per can for a total purchase price that should have been $25.98, petitioner wrote "$84.95" in the box indicating how much the purchased product sold for and redeemed the food instrument for that full amount from DHS.

On August 1, 2005, Sorenson purchased three cans of Enfamil from petitioner. The food instrument allowed for the purchase of up to five cans. Although the total shelf price for the three cans that Sorenson purchased was $50.97, petitioner redeemed the food instrument for $84.95, the price of five cans.

On August 24, 2005, Sorenson purchased three cans of Enfamil from petitioner. Again, although the total shelf price for the food items actually purchased was $50.97, petitioner redeemed the food instrument for $84.95, the price of five cans.

DHS initiated the present case by sending petitioner a notice of proposed termination of the vendor agreement. The notice asserted that petitioner (1) committed a pattern of vendor overcharges, in violation of OAR 333-054-0050(3)(b)(C), and (2) committed a pattern of charging for authorized food not received by the authorized shopper, in violation of OAR 333-054-0050(3)(b)(E). An administrative law judge concluded in a proposed final order that petitioner's actions amounted to a pattern of vendor overcharges but not a pattern of charging for authorized foods not received by the authorized shopper. In its final order, DHS found that petitioner had engaged in a pattern of vendor overcharges and a pattern of charging for authorized foods not received by the authorized shopper. Either violation would suffice to justify the three-year disqualification imposed. Petitioner seeks judicial review.

■      Petitioner contends that DHS erroneously interpreted OAR 333-054-0050(3)(b)(C) by ignoring its plain meaning. The rule provides that a "vendor overcharge" is "intentionally or unintentionally charging DHS more for *authorized foods* than the actual shelf price or the price they charge other shoppers." OAR 333-054-0010(28) (emphasis added). According to petitioner, the July 1, 2005, purchase of Similac—*not* an authorized food—cannot serve as the basis for a violation of the rule. Without the July 1, 2005, vendor overcharge, only two overcharges occurred, so there is no "pattern."

DHS responds that OAR 333-054-0050(3)(b)(C) and OAR 333-054-0010(28) can plausibly be interpreted to cover the situation in this case. According to DHS, the definition of "vendor overcharge" can be paraphrased as follows: a "vendor overcharge" is "intentionally or unintentionally charging DHS more for authorized foods than the actual shelf price *of*

*the authorized foods that the buyer purchased* or the price they charge other shoppers."[2] Petitioner charged DHS for five cans of Enfamil, an authorized food. The actual shelf price of the authorized food that Sorenson purchased was therefore zero. Thus, according to DHS, petitioner violated the rule.

■ ■    An agency may determine whether the standard established in a rule has been met in a particular instance by interpreting the rule in the course of applying it. *Papas v. OLCC*, 213 Or App 369, 377, 161 P3d 948 (2007); *Goin v. Employment Dept.*, 203 Or App 758, 763-64, 126 P3d 734 (2006). We defer to the agency's plausible interpretation of its own rule, including an interpretation made in the course of applying the rule, if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law. *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994); *Papas*, 213 Or App at 377; *Goin*, 203 Or App at 763-64.

■    Petitioner argues that, because the violation included charging DHS for unauthorized food and two different administrative rules[3] speak more directly to that offense—and impose only one-year disqualifications—this administrative rule must be construed to avoid duplication. However, DHS may exercise its discretion in choosing the most appropriate rule violation charges to bring against a noncompliant vendor. At best, petitioner's argument suggests an alternative, plausible construction of the DHS rule. And it is settled law that a petitioner's plausible alternative construction of an agency rule does not mean that the agency's own construction is implausible. *Oregon Restaurant*

---

[2] We understand that we are "not to insert what has been omitted." ORS 174.010; *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993) (ORS 174.010 applies to determination of statute's plain meaning); *id.* at 612 n 4 (same interpretative method used for statutes and administrative rules). That precept, however, does not prevent this court or parties before it from attempting to explicate statutes or rules by paraphrasing them, which will necessarily involve the "insertion" of omitted words to the extent that the phrase applies to explanatory clarifications.

[3] OAR 333-054-0050(3)(a)(A) provides for a one-year disqualification upon a showing of "[a] pattern of providing unauthorized food items, in exchange for food instruments, including charging for authorized food provided in excess of those listed on the food instrument." OAR 333-054-0050(3)(a)(B) provides for a one-year disqualification upon a showing of "[a] pattern of allowing the purchase of brand names or food types other than those listed on the WIC Authorized Food List."

*Services v. Oregon State Lottery*, 199 Or App 545, 562, 112 P3d 398, *rev den*, 339 Or 406 (2005); *Purdue Pharma, L.P. v. Dept. of Human Services*, 199 Or App 199, 209, 110 P3d 657, *rev den*, 339 Or 156 (2005).

However, in the present case, the agency's construction *is* implausible; it cannot be reconciled with the plain language of the rule. The rule presupposes the purchase of authorized food, and that did not occur here. Contrary to DHS's theory, nothing in the rule justifies an interpretation that ties the "actual shelf price" to the price paid by a specific purchaser. "Actual" denotes an objective standard. The "actual" price of a can of infant formula is the price that exists according to some empirically verifiable measurement unassociated with any particular purchaser. *See Webster's Third New Int'l Dictionary* 22 (unabridged ed 2002) ("actual" means "existing in fact or reality"). We therefore conclude that, although petitioner may well have violated some other rule, it did not violate OAR 333-054-0050(3)(b)(C) by charging DHS for five cans of Enfamil when the purchaser bought two cans of Similac.

■    The agency's interpretation of OAR 333-054-0050(3)(b)(E) presents a similar problem. That rule, as noted above, prohibits vendors from charging DHS for "authorized foods not received by the authorized shopper." Petitioner paraphrases the rule as prohibiting a merchant from overcharging DHS *with respect to an authorized shopper's purchase*. In other words, according to petitioner, the universe of purchases that can potentially result in violations includes only those in which the purchaser is an authorized shopper, and no such purchase occurred here. The state responds that we must read the rules in context. The WIC Program is a federally funded program, and federal law governing state participation requires "a representative of the [state] Program" to monitor vendors through compliance buys. 7 CFR § 246.2. Further, Oregon law requires DHS to adopt standards and procedures in order to stay in conformity with federal requirements. ORS 409.600(2). Pursuant to that mandate, DHS has adopted rules authorizing compliance

buys through OAR 333-054-0040[4] and OAR 333-054-0010(8).[5] The state contends that, because these rules authorize the representative to "transact" a WIC food instrument, DHS reasonably construes its rules authorizing compliance buys to have the effect of either (1) amending OAR 333-054-0050(3)(b)(E) and OAR 333-054-0010(5) to include state representatives engaged in such transactions in the category of "authorized shoppers"; or (2) creating an exception to the limitation.

As stated previously, we defer to the agency's plausible interpretation of its own rule, including an interpretation made in the course of applying the rule, if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law. *Don't Waste Oregon Com.*, 320 Or at 142; *Papas*, 213 Or App at 377; *Goin*, 203 Or App at 763-64. In determining that petitioner violated OAR 333-054-0050(3)(b)(E), DHS interpreted the rule to mean that an "authorized shopper" includes a DHS representative posing as a participant or a participant's designee. That "interpretation" cannot be reconciled with the text of the rule itself. To reiterate, OAR 333-054-0010(5) defines "authorized shopper" to mean "the [WIC Program] participant or any person designated by a participant who has been documented as such at the local agency to act on the participant's behalf and, in the case of an infant or child, the caretaker or the caretaker's designee." And a participant is "any pregnant woman, breast-feeding woman, post-partum woman, infant or child who received authorized foods or food instruments under the WIC Program, and the breastfed infant of any participating woman." OAR 333-054-0010(17). We agree with petitioner that this language is clear and unequivocal.

Nor are we persuaded by DHS's argument that the rules requiring the state to undertake compliance buys

---

[4] OAR 333-054-0040 provides:

"(1) DHS shall monitor vendors for compliance with applicable laws and rules, including on-site investigation of randomly selected vendors.

"(2) DHS or its authorized representative may conduct compliance buys to collect evidence of improper vendor practices."

[5] OAR 333-054-0010(8) defines "compliance buy" to mean a "single covert, on-site visit in which a DHS representative poses as an authorized shopper and attempts to transact, or transacts, one or more food instruments."

somehow "amend" OAR 333-054-0010(5) and OAR 333-054-0010(17) or create an exception to those rules. If DHS wanted to amend the definitions so as to include undercover compliance buyers as "authorized shoppers," it could easily do so. In fact, it *has* done so. OAR 333-054-0010(7) (Dec 27, 2006) now defines "authorized shopper" to include "any DHS representative posing as a participant or participant designee as authorized by DHS." We therefore reject DHS's argument.[6]

Reversed and remanded.

---

[6] DHS does not advance (and we do not address) the argument that, under the rule, a violation occurs whenever a merchant charges DHS for authorized food that is "not received by an authorized shopper" because, in such transactions, the food is received by an *un*authorized shopper. That interpretation differs from petitioner's in that it would permit DHS to find a violation whenever the purchaser is an unauthorized shopper, including every compliance buy; petitioner's interpretation permits DHS to find a violation only when an authorized shopper's purchases are inflated when presented to DHS.