Argued and submitted December 13, 2004, on appeal, vacated and remanded with instructions to dismiss petition for judicial review; supplemental judgment for attorney fees and costs vacated; cross-appeal dismissed as moot May 18, 2005

## OREGON RESTAURANT SERVICES, INC.,
*Respondent - Cross-Appellant,*

*v.*

## OREGON STATE LOTTERY
and Oregon State Lottery Commission,
*Appellants - Cross-Respondents.*

98C-12676; A114146

112 P3d 398

546

Richard D. Wasserman, Attorney-in-Charge, Civil/Administrative Appeals Unit, argued the cause for appellants - cross-respondents. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Jeffrey P. Chicoine argued the cause and submitted the briefs for respondent - cross-appellant. With him on the briefs was Newcomb, Sabin, Schwartz & Landsverk, LLP.

Before Landau, Presiding Judge, and Armstrong, Judge, and Deits, Judge pro tempore.

LANDAU, P. J.

**LANDAU, P. J.**

The Oregon State Lottery and the Oregon State Lottery Commission—which, unless otherwise indicated, we refer to collectively as "the lottery"—adopted a rule that states a policy of not contracting with businesses whose "dominant use or dominant purpose" is making money from lottery games. The lottery incorporated that rule into contracts with establishments that sell lottery products. This case involves the interpretation and application of such contracts with petitioner, which operates restaurants that sell lottery products.

In brief, the lottery sent letters to petitioner informing petitioner that the lottery had concluded that the amount of money generated by petitioner's sale of lottery products at its 21 restaurants was a sufficiently large percentage of the restaurants' total income that the establishments ran afoul of the "dominant use or dominant purpose" rule. The letters stated that petitioner could dispute the lottery's conclusion and set forth the process for doing so. The letters also stated that, if petitioner failed either to challenge the lottery's determination or to bring its establishments into compliance, the lottery would terminate the contracts.

Petitioner sought judicial review of the letters in Marion County Circuit Court. The lottery moved to dismiss on the ground that the court lacked jurisdiction. The trial court denied the motion, determined on the merits that the lottery's issuance of the 21 letters amounted to an instance of unlawful, *ad hoc* rulemaking, and, in a supplemental judgment, awarded approximately $160,000 in attorney fees. The lottery appeals, arguing that the trial court erred in denying the motion to dismiss and in concluding that, on the merits, the agency's letters to petitioner were unlawful. Petitioner cross-appeals, arguing that the trial court should have awarded certain ancillary relief as well as additional attorney fees.

We conclude that the lottery is correct that the trial court erred in denying the motion to dismiss. We therefore reverse and remand with instructions to enter a judgment of

dismissal. As a result, we also vacate the supplemental judgment. As for the cross-appeal, our decision on the lottery's appeal renders it moot.

## I. BACKGROUND

We begin with a brief overview of the regulatory framework for the parties' dispute and proceed to a summary of the relevant facts.

### A. *Regulatory framework*

Article XV, section 4(3), of the Oregon Constitution creates a State Lottery Commission, which is required to operate a state lottery, which, in turn, is authorized to operate various lottery games to raise revenue for a number of specified state purposes. The constitution further provides, however, that the legislature "has no power to authorize, and shall prohibit, casinos from operation in the State of Oregon." Or Const, Art XV, § 4(12).

In *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 562, 871 P2d 106 (1994), the Oregon Supreme Court concluded that, in adopting the prohibition against casinos stated in Article XV, section 4(12), "the voters intended to prohibit the operation of establishments whose dominant use or dominant purpose, or both, is for gambling." At issue in that case was the facial validity of statutes that authorized the lottery to initiate video lottery games by contracting with various businesses to operate up to five video lottery terminals at each contracting business location. The plaintiffs had argued that permitting the operation of video lottery games in such businesses amounted to authorization of the operation of "casinos" in violation of Article XV, section 4(12). The Supreme Court disagreed, concluding that the presence of five video lottery game terminals in a business does not necessarily mean "that gambling is the dominant use or dominant purpose, or both, of the establishment." *Id.* at 564.

In response to the court's interpretation of Article XV, section 4(12), the State Lottery Commission adopted OAR 177-040-0060, which begins with a declaration that "[i]t shall be the policy of the Oregon State Lottery to not contract

with any establishment whose dominant use or dominant purpose, or both, is for the sale of lottery games." OAR 177-040-0060(1).[1] Whether the "dominant use or dominant purpose, or both," of a given establishment is the sale of lottery games is a determination delegated to the Director of the State Lottery. OAR 177-040-0060(2). The director is authorized to rely "on whatever resources and information are available in terms of making an inquiry regarding the dominant use or dominant purpose, or both, of an establishment." *Id.* In all events, the burden of proof for establishing the dominant use or dominant purpose, or both, of an establishment rests with the establishment, not the director. *Id.*

In making the determination as to an establishment's dominant use or dominant purpose, or both, the director is required to consider a number of factors. Among them is an "income analysis," which entails a determination whether the establishment's annual net receipts from the sale of lottery games exceeds two-thirds of the establishment's "total income." OAR 177-040-0060(3)(b). An establishment's "total income" consists of the sum of the establishment's "gross annual sales of its non-Lottery products" plus net receipts from the sale of lottery products. *Id.*

If the director determines that the dominant use or dominant purpose, or both, of an establishment is the sale of lottery games, the director is obligated to notify the establishment of that determination. OAR 177-040-0060(4)(a). The director must "provide the establishment the opportunity to develop and implement a plan to bring the establishment into compliance within six months from the date of notification." *Id.* The establishment's plan must be submitted within 30 days of the director's notification and must include an analysis of the business operation to show that the establishment has made "a reasonable determination of what changes need to be made and the steps the retailer intends to take * * * to bring the establishment into compliance." *Id.* The establishment then has the balance of the six-month period to bring itself into compliance. *Id.* If, at the end of that period, the director determines that the establishment remains out

___

[1] References to OAR 177-040-0060 and to other rules and statutes are to versions in effect at the time of the lottery's action that are at issue in this appeal.

of compliance, the director must terminate the lottery's contract with the establishment. OAR 177-040-0060(4)(c).

B.  *Relevant facts*

The facts relevant to this appeal appear to be uncontested. Petitioner is a privately held corporation that operates 22 restaurants under the name "Dotty's Country Classic Cafe" in the tri-county metropolitan area. The restaurants offer a variety of appetizers, sandwiches, snack foods, coffee and tea, soft drinks, juices, beer, and wine.

Plaintiff entered into contracts with the lottery for the operation of video and other lottery games at each restaurant. Each contract expressly incorporated the various foregoing constitutional, statutory, and regulatory provisions pertaining to the operation of the lottery:

> "I understand that the contract I have with the Lottery consists not only of this document but that it includes and incorporates by reference the following laws and rules as well. Where applicable, these laws and rules shall control the application and operation of my contract with the Lottery in the following order:
>
> "1.1   Article XV, [s]ection 4, of the Constitution of the State of Oregon;
>
> "1.2   The Oregon State Lottery Act (ORS chapter 461), as it may be amended from time to time; and
>
> "1.3   The Oregon State Lottery's Administrative Rules (OAR [c]hapter 177), as they may be amended from time to time."

The contracts further provide that each of petitioner's restaurants will perform the duties and requirements contained in the lottery's rules, "which are a part of this contract," and that, if the restaurant fails to do so, the lottery has the right to, among other things, terminate the contract.

Each Dotty's restaurant has five video poker lottery machines on site. In addition, the menu at each of the restaurants states that Dotty's offers "All Lottery Games . . . Great Fun . . . Great Friends . . . and Win Prizes!" In addition, the menus state that the restaurants offer "complimentary" soft drinks, hot beverages, candy, and snacks. The restaurants

also print fliers advertising "special events" that take place virtually every day of the year, such as "Dotty's Luau," "Mardi Gras at Dotty's," "Cinco de Mayo Festival," "Astrology Day," "Donut Day," "Hot Dog Night," "50's Revival Weekend," and "New Year's Eve at Dotty's."

For the purpose of calculating whether its restaurants complied with the dominant use or purpose rule, petitioner calculated its gross annual sales of nonlottery products by including the retail value of complimentary food and beverages. In other words, petitioner calculated as part of its total income the value of goods that its restaurants gave away for free. That had the mathematical effect of permitting the restaurants to earn more lottery-related income without exceeding the two-thirds maximum set by the lottery's administrative rule.

At some point before November 1997, the lottery became aware of petitioner's accounting practice. The lottery interpreted "gross annual sales" to exclude the value of complimentary food and beverages as part of an establishment's gross annual sales of nonlottery products. It did not, however, adopt a rule expressly embodying that interpretation.

In November 1997, a financial analyst with the lottery sent nine two-page letters to petitioner, each pertaining to one of petitioner's Dotty's restaurants. The analyst explained that she had completed a review of each restaurant's compliance with the lottery's rules and that the available records showed that each of the restaurants was not in compliance with the rule, that is, that the video lottery commissions exceed two-thirds of the restaurant's total income. The letter continues with the following information:

"If you dispute this determination, you may hire an independent Certified Public Accountant (CPA) to perform another review. The CPA must be approved by the Oregon Lottery, and must follow agreed upon procedures for performing the review. Your failure to accept such procedures will be grounds for termination of your contract with the lottery.

"* * * * *

"You have an opportunity to develop and implement a plan to bring your establishment into compliance within six months of the date of this notice. * * * Your plan *must* include an analysis of your business operation to show that you have made a reasonable determination of what changes need to be made, and the specific steps you intend to take to make the changes to bring your business into compliance. Your plan should focus on efforts to increase your non-Lottery business, specifically, the sale and service of food and beverages for consumption by your retail customers.

"You must submit monthly sales data on your non-Lottery products for each of the six months from the date of this notice. * * *

"After I have reviewed your sixth month * * * sales data, the Lottery will make a determination as to whether you are in compliance for that six-month period. You will be deemed to be in compliance if your sales data show that you were in compliance for *either* the entire six-month period, or the sixth month of the period. If you are *not* in compliance at the end of the six months, the Lottery will terminate your contract. If you *are* in compliance at the end of the six months, we will review your business again after the following 12-month period."

(Emphasis in original.) The analyst closed with thanks for petitioner's assistance with the review "and with the remainder of this process."

In January 1998, the lottery sent petitioner 12 more letters substantially identical to the ones that it sent in November. The 12 letters concerned the failure of 12 other Dotty's restaurants to comply with the lottery's "dominant use or dominant purpose, or both" rules.

Petitioner did not take advantage of the opportunity to dispute the lottery analyst's determinations as permitted under the rule and as described in her letters. Instead, petitioner sought judicial review of the letters in circuit court. In its amended petition for judicial review, petitioner asserted that the letters were final orders and that it was aggrieved by the letters because they "have compelled [petitioner] to substantially change its operation in order to avoid termination of its video lottery contracts." Petitioner also asserted that the compelled changes or, alternatively, the loss of its video

lottery contracts had caused or would cause substantial and irreparable harm to it and that, even if the letters were not final orders, it therefore was entitled to interlocutory review of the lottery's actions.

On the merits, petitioner asserted that OAR 177-040-0060 is invalid because, under Article XV, section 4(12), only the legislature is authorized to enforce the constitutional prohibition on the operation of casinos. Petitioner also asserted that the lottery rule does not properly effectuate the prohibition on casinos because it fails properly to implement the applicable dominant use or dominant purpose principle. In addition, petitioner asserted that the rule violates the Equal Protection and Due Process clauses of the Fourteenth Amendment to the United States Constitution and Article I, section 20, of the Oregon Constitution. Finally, petitioner asserted that the lottery failed to adhere to the rule and instead applied to it unwritten standards, in violation of the Administrative Procedures Act (APA). Petitioner requested that the court declare OAR 177-040-0060 invalid, that it set aside the lottery's actions, that it award ancillary relief for lost profits, and that it award petitioner its attorney fees.

The lottery moved to dismiss for lack of subject matter jurisdiction. According to the lottery, the 21 letters that are the subject of the petition are not "final orders" subject to circuit court review under ORS 183.484. By the terms of the letters themselves, the lottery argued, as well as by the rules that the letters incorporated, each of the 21 letters preceded final lottery action and did not preclude further agency consideration.

The trial court denied the motion and, after further motions from the parties, found in favor of petitioner on the merits. Concerning its jurisdiction, the trial court concluded that each of the 21 letters was a "final order" issued in other than a contested case and therefore subject to review under ORS 183.484. In the alternative, the court concluded that—even if the letters are not "final orders" within the meaning of the APA—the court had jurisdiction to review them under ORS 183.480(3), pertaining to review of nonfinal orders in cases in which the agency is proceeding without probable cause or in which the agency's action will create substantial

and irreparable harm. The court also concluded that, even if it did not have jurisdiction to review the letters under ORS 183.484 or ORS 183.480(3), it nevertheless had jurisdiction to review them under ORS 183.400(2) because the letters amounted to agency enforcement of a rule.

On the merits, the trial court concluded that the lottery's interpretation of the term "gross annual sales" as used in OAR 177-040-0060(3)(b) was invalid because, in arriving at that interpretation, the lottery failed to satisfy the requirements for adopting an administrative rule. As a result, the court set aside each of the 21 letters. The court, however, denied petitioner's request for "ancillary" relief in the form of an award of damages for lost profits. In a supplemental judgment, as we have noted, the court also awarded petitioner approximately $160,000 in attorney fees.

## II. DISPOSITION OF THE MERITS

On appeal, the lottery advances a number of assignments of error, including two concerning the trial court's denial of its motion to dismiss. Because we find them dispositive, we address only those assignments.

The lottery argues that the trial court erred in concluding that, under each of three provisions of the APA, it had jurisdiction to review petitioner's challenge to the 21 letters. We address the parties' arguments as to the jurisdiction of the trial court under each of those statutes in turn.

### A. *Jurisdiction under ORS 183.484*

The lottery first argues that the trial court erred in concluding that it had jurisdiction under ORS 183.484 because that statute authorizes the court to review only "final orders." According to the lottery, the 21 letters that are the subject of the petition are not final orders because, by their very terms, they preceded final agency action and did not preclude further consideration by the lottery of the conclusion that each of the Dotty's restaurants had violated the lottery rules.

Petitioner argues that the letters should be treated as final orders because, although they expressly provided a process for contesting the financial analyst's determination

of noncompliance, they nevertheless plainly stated that each of the restaurants was out of compliance. Moreover, petitioner argues, the letters in effect directed it either to develop a plan of compliance or suffer the termination of its contracts. The fact that the letters identified a process by which it could contest the analyst's determination, petitioner argues, amounts to no more than an opportunity to seek reconsideration of what, in reality, was a final determination by the lottery itself.

Whether ORS 183.484 confers jurisdiction to review the letters at issue in this case is a matter of statutory construction. Accordingly, we examine the text of the statute in context and, if necessary, other aids to construction to determine the interpretation of the statute that the legislature most likely intended. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993).

ORS 183.484 provides, in part:

"(1) Jurisdiction for judicial review of orders other than contested cases is conferred upon the Circuit Court for Marion County and upon the circuit court for the county in which the petitioner resides or has a principal business office. Proceedings for review under this section shall be instituted by filing a petition in the Circuit Court for Marion County or the circuit court for the county in which the petitioner resides or has a principal business office."

Thus, the statute confers jurisdiction on the circuit court to review "orders [in] other than contested cases." ORS 183.480(3), however, qualifies that conferral of jurisdiction:

"No action or suit shall be maintained as to the validity of any agency order except a final order as provided in this section and ORS 183.482, 183.484, 183.490 and 183.500 or except upon showing that the agency is proceeding without probable cause, or that the party will suffer substantial and irreparable harm if interlocutory relief is not granted."

*See also Tidewater Contractors, Inc. v. BOLI*, 151 Or App 293, 298-99, 948 P2d 750 (1997) ("With certain exceptions not applicable here, ORS 183.480(3) provides that only *final* orders are subject to judicial review." (Emphasis in original.)).

■     The APA defines "final order" as follows:

" 'Final order' means final agency action expressed in writing. 'Final order' does not include any tentative or preliminary agency declaration or statement that:

"(A)   Precedes final agency action; or

"(B)   Does not preclude further agency consideration of the subject matter of the statement or declaration."

ORS 183.310(6)(b). Whether a particular agency's order is "final" within the meaning of the statute depends on the context of the regulatory scheme in which the agency's statement or declaration was made. *Teel Irrigation Dist. v. Water Resources Dept.*, 323 Or 663, 675-77, 919 P2d 1172 (1996). We therefore turn to the regulatory context in which the lottery sent the letters to petitioner.

■     As we have noted, OAR 177-040-0060 provides that the director of the Oregon State Lottery is charged with determining whether an establishment with which the lottery has contracted to provide lottery products complies with the dominant use and dominant purpose rule. OAR 177-040-0060(2). The rule further provides that the director must consider various factors in making "a final determination" of compliance. OAR 177-040-0060(3). Among those factors is the "income analysis" that involves a review of the establishment's total income in proportion to its annual share of the net receipts that it receives from the sale of lottery products. OAR 177-040-0060(3)(b). If the director determines that the establishment does not comply with the dominant use and dominant purpose rule, the rule requires that the director "provide the establishment the opportunity to develop and implement a plan to bring the establishment into compliance." OAR 177-040-0060(4)(a). Only at the end of such a six-month period is the director authorized to determine whether the establishment has brought itself into compliance, and only if the establishment does not bring itself into compliance (unless it simply refuses to make any effort to do so at the beginning of the process) is the director authorized to terminate the contract. OAR 177-040-0060(4)(c).

    In that context, it is clear that the letters sent by the lottery's analyst were not "final orders" within the meaning

of the statute. They were, instead, merely an initial step in the process of ensuring compliance. The letters did not preclude further action by the lottery. Indeed, the lottery was *required* to take additional steps in order to complete the review process. Among other things, as the letters expressly stated, the lottery was required to permit petitioner to hire an independent CPA to contest the lottery's review.

It could be argued—although we did not encounter the argument in petitioner's briefing—that, although the letters and the applicable administrative rule provide a process for challenging the lottery's noncompliance determination, the fact remains that the lottery's determination is based on an interpretation that is not subject to challenge in that subsequent process. In other words, although the lottery's determination may not be "final" in some respects, it is in others. We are unaware of any authority, however, that permits us to break down an administrative order into components and determine finality on a component-by-component basis. Either an administrative order is final or it is not. ORS 183.310(6)(b). Moreover, basic principles of ripeness and exhaustion would seem to counsel against such a practice. If, for example, petitioner were to retain a CPA to challenge the lottery's determination and that CPA persuaded the lottery that it had miscalculated the percentage of total income attributable to the net receipts from lottery sales, then it would be unnecessary even to address the validity of the lottery's interpretation of the "gross annual sales" component of the analysis.

Petitioner insists that a conclusion that the letters were not final orders would be inconsistent with our decision in *Aplanalp v. Board of Optometry*, 21 Or App 501, 535 P2d 573 (1975). In that case, however, the sole issue was whether an optometrist could challenge the Board of Optometry's cease and desist order without having to wait for the board to revoke his license. Citing a line of decisions concerning the ripeness of declaratory judgment claims, we concluded that the optometrist could challenge the cease and desist order. *Id.* at 505. We did not apply the definition of the term "final order" in ORS 183.310(6)(b); that provision had not yet been enacted.

Closer to the mark is our decision in *Tidewater*. In that case, a general contractor asked the administrator of the Bureau of Labor and Industries' (BOLI) Wage and Hour Division whether it was obligated to pay its workers the prevailing wage rate on a contract with the Oregon Department of Transportation (ODOT). A BOLI employee sent a letter to the contractor asserting that the contractor indeed was required to pay the prevailing wage rate. The contractor then brought an action in circuit court challenging the letter, arguing that the letter was a "final order" in other than a contested case, reviewable under ORS 183.484. We concluded that the letter was not a "final order" within the meaning of ORS 183.310(6)(b). Noting that the relevant statutes authorized the labor commissioner to take any number of different enforcement actions to determine the correctness of the letter of advice and enforce the law, we concluded that the letter was not a final determination of the contractor's obligation to pay the prevailing wage rate and did not preclude further action by the labor commissioner to enforce the law. *Tidewater*, 151 Or App at 298-99.

So also in this case, the analyst's letters did not preclude the lottery director from taking other action, depending on—among other things—the results of an independent review by petitioner's own CPA. We conclude that the trial court erred in determining that the letters are final orders that are reviewable under ORS 183.484.

B.  *Jurisdiction under ORS 183.480(3)*

We turn to the trial court's conclusion that, even if it did not have jurisdiction to review the letters under ORS 183.484, it did have jurisdiction to review them under ORS 183.480(3). As we have noted, that statute states an exception to the ordinary requirement that the courts may review only final orders "upon showing that the agency is proceeding without probable cause, or that the party will suffer substantial and irreparable harm if interlocutory relief is not granted." ORS 183.480(3). In this case, the court concluded both that the lottery letters amounted to agency action without probable cause and that the letters, if enforced, would inflict upon petitioner substantial and irreparable harm. We address each of those conclusions in turn.

## 1. *Probable cause*

The lottery argues that the court erred in concluding that it was proceeding without probable cause. The lottery notes that the principal issue involves its interpretation of the contracts with petitioner, in particular, the term "gross annual sales," which is incorporated in the contracts by reference to OAR 177-040-0060. Because it reasonably construed the term not to include items that an establishment gives away, the lottery argues, it proceeded with probable cause.

In response, petitioner argues that the lottery lacked probable cause because its interpretation of the contract—and the administrative rule that is incorporated by reference—amounted to "a series of seat-of-the-pants determinations, each made without the slightest reference to applicable administrative rule-making procedures." According to petitioner, the lottery's supposed interpretation of "gross annual sales" actually is a policy decision to exclude complimentary products from the income analysis that the rule requires. Moreover, petitioner complains, the agency's decision fails even if it is characterized as an exercise in interpretation. Petitioner argues that "gross annual sales" is a business term of art that has an accepted meaning that includes the full value of complimentary or discounted items. Thus, petitioner concludes, any way the lottery's decision is characterized, it amounts to proceeding without probable cause.

An agency has "probable cause" to proceed within the meaning of ORS 183.480(3) when "the facts and circumstances provide an objectively reasonable basis for the agency to proceed." *Brian v. Oregon Government Ethics Commission,* 320 Or 676, 683-84, 891 P2d 649 (1995). To determine whether a particular agency has an objectively reasonable basis to proceed, the court considers the agency's statutory grant of authority. *Id.*

We have previously explained that "probable cause" as the term is used in ORS 183.480(3) has a "quite narrow[ ]" meaning. *Brian v. Oregon Government Ethics Commission,* 126 Or App 358, 362, 868 P2d 1359 (1994). The statute does not permit premature judicial review of interlocutory agency

actions simply because they may be erroneous and might serve as a basis for reversal after there is a final order. *Id.*

■ The determination whether an agency had probable cause is a legal question for the court. *Brian*, 320 Or at 684 (citing *Gustafson v. Payless Drug Stores*, 269 Or 354, 357, 525 P2d 118 (1974)). Thus, we do not defer to the agency as to whether it had probable cause. *Id.* In making that legal determination, however, we must consider the rules that govern the agency in making the decision that is under scrutiny. Thus, when the challenged agency action involves a matter of interpretation, we must apply the rules of interpretation to which the agency itself would be subject.

■ In this case, petitioner challenges the lottery's interpretation of a term employed in an administrative rule that has been incorporated by reference into a contract. Ordinarily, when construing the terms of a contract, we are required to apply the general rules of contract interpretation, as set forth in *Yogman v. Parrott*, 325 Or 358, 361-65, 937 P2d 1019 (1997). When, however, a contract incorporates by reference the terms of an administrative rule, we must apply the rules of interpretation that apply to administrative rules. *Coats v. ODOT*, 188 Or App 147, 151, 71 P3d 172 (2003). Moreover, when a contract with an administrative agency incorporates an agency's own rule, the interpretation of that incorporated rule is subject to the substantial deference that agencies are due under *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994). *Coats*, 188 Or App at 152.

In other words, although the determination of probable cause itself is not subject to deference, when we determine whether, as a matter of law, an agency proceeded without probable cause in interpreting its own rule, we must include in our evaluation the fact that the agency's interpretation must be upheld as long as it is plausible and not at odds with the authorizing statute or any other source of law. *Don't Waste Oregon Com.*, 320 Or at 142 (An agency's construction of its own rule must be upheld unless "shown either to be inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law[.]").

■       Turning to the particulars of this case, each of the contracts with petitioner incorporated the terms of OAR 177-040-0060. That rule requires the director to engage in an income analysis, one component of which is a determination of an establishment's "gross annual sales." The rule does not include a definition of "gross annual sales." When the lottery issued the 21 challenged letters to petitioner, it interpreted the term "gross annual sales" to exclude the value of complimentary or discounted items. It is the lottery's interpretation of that term that is the focus of the parties' arguments about whether the agency proceeded without probable cause. We therefore turn to an evaluation of the plausibility of the lottery's construction of its own rule.

       In ordinary parlance, the noun "sale" refers to "the act of selling" and "a present transfer of * * * ownership * * * for a price paid or payable in money * * * distinguished from *gift.*" *Webster's Third New Int'l Dictionary* 2003 (unabridged ed 2002) (emphasis in original). The plural noun "sales" means "operations and activities in promoting and selling goods or services" and "gross receipts." *Id.* To sell is "to give up (property) to another for money or other valuable consideration." *Id.* at 2061. Nothing about the lottery's construction of the phrase "gross annual sales" is inconsistent with the ordinary meaning of those words.

       The relevant context includes lottery rules employing the same or similar terms. There are, in fact, a number of other lottery rules referring to "sales" of lottery products. In every case, the use of the term "sales" clearly refers to actual exchanges for money, not the value of gifts or gratuities. *See, e.g.,* OAR 177-040-025(1)(a) (referring to retailer commissions as a percentage of "average weekly sales" of lottery products); OAR 177-040-0025(1)(b) (referring to "total sales for all lottery products during a bonus sales period"); OAR 177-040-0025(1)(c) ("The bonus sales period does not begin until the Base Average has been established unless the bonus sales average is $6,000 or more."); OAR 177-040-0025(2) (referring to commission rates for "lottery products sold"); OAR 177-040-0040(2) ("The minimum weekly sales average for all Lottery products shall be $1,000."); OAR 177-040-0040(3) (retailers that fail to meet the "minimum weekly

sales average" are placed on a "Sales Improvement Program"); OAR 177-040-0040(4) (a lottery retailer that is subject to termination for failing to meet the minimum weekly sales average and that has failed to participate in the Sales Improvement Program can avoid termination by paying "an amount to maintain the retailer's contract equal to $1,000 less five cents for each dollar of traditional games sold during the last sales quarter").

In short, nothing in the text of OAR 177-040-0060 or its context is inconsistent with the lottery's interpretation of "gross annual sales" to exclude the value of complimentary products. To the contrary, the lottery's interpretation is consistent with the ordinary meaning of the words and the way in which the same words are employed elsewhere in the agency's administrative rules.

Petitioner insists that, notwithstanding the deference that *Don't Waste Oregon Com.* compels, the lottery's interpretation is unreasonable. According to petitioner, the term "gross annual sales" actually is a term of art within the restaurant business and that the recognized meaning of the term includes the value of complimentary or discounted products. At best, however, petitioner's argument suggests an alternative, plausible construction of the lottery rule. The fact that some particular industries subject to an administrative rule may have a common understanding of the rule's meaning does not mean that the particular meaning is the only one that is definitionally possible or legally plausible. *See Purdue Pharma, L.P. v. Dept. of Human Services*, 199 Or App 199, 209, 110 P3d 657 (2005) (a petitioner's plausible alternative construction of an agency rule does not mean that the agency's own construction is implausible).

We conclude that the lottery did not proceed without probable cause.

2. *Irreparable harm*

We turn to whether the circuit court nevertheless had jurisdiction because the lottery's letters were causing petitioner irreparable harm. Petitioner complains that, "[w]ithout any interlocutory relief from the court, the Lottery's letter-orders would have resulted in termination of the

video lottery contracts." That, petitioner contends, would have resulted in lost profits, which loss constitutes substantial and irreparable harm. In turn, the lottery argues that its letters do not require termination and, in any event, the types of loss that petitioner would suffer as a result of termination are purely economic and, by definition, not irreparable.

We agree with the lottery. Once again, petitioner's argument assumes that the lottery's letters operate as if they were final orders that have the effect of terminating petitioner's contracts. As we have noted, termination results only if, after the review process described in the letters, petitioner continues to fail to comply with the requirements of the dominant purpose or dominant use rule. Moreover, the type of harm that petitioner would suffer even if termination were to result from the enforcement of the letters themselves is purely economic and is recoverable in a breach of contract action. *See, e.g., Premier Technology v. Oregon State Lottery*, 136 Or App 124, 901 P2d 883 (1995) (allowing breach of contract action against the lottery for damages arising out of termination of lottery contracts). We conclude that the circuit court erred in ruling that it had jurisdiction under ORS 183.480(3) to review the lottery's actions on the ground that petitioner was subject to irreparable harm.

C. *Jurisdiction under ORS 183.400*

■    ORS 183.400(2) provides, in part, that "[t]he validity of any applicable rule may also be determined by a court * * * upon the enforcement of such rule * * * in the manner provided by law." The trial court concluded that, if nothing else, that statute confers jurisdiction to review the petition in this case. The lottery argues that the trial court erred in arriving at that conclusion because, under the Oregon Supreme Court's decision in *Coats v. ODOT*, 334 Or 587, 54 P3d 610 (2002), ORS 183.400(2) does not apply to cases in which an agency is enforcing *a contract* that happens to incorporate an administrative rule. Petitioner argues that *Coats* is distinguishable on its facts and that, whether or not the rule was incorporated into a contract, the fact remains that the agency is enforcing it in the challenged letters.

In *Coats*, the plaintiff contracted with ODOT to supply aggregate for a highway construction project. The contract incorporated rules that BOLI had promulgated to implement a statute requiring workers to be paid prevailing wages. During the course of the plaintiff's performance of the contract, BOLI sent him a letter informing him that, under the terms of the rules incorporated into the contract, he was required to pay his workers prevailing wages. When the plaintiff did not comply, ODOT began withholding payments on the contracts. 334 Or at 589-92.

The plaintiff initiated a civil action in the circuit court for breach of contract. In the same action, the plaintiff asked the court, pursuant to ORS 183.400(2), to review the validity of the BOLI rule. He moved for summary judgment, arguing that ODOT could not require him to comply with invalid rules and that, in the alternative, the rules did not actually require him to pay prevailing wages to his workers. The state responded that, even assuming that the rules themselves were invalid, they were incorporated into the contract and made part of it. As a result, the state argued, as a matter of contract law, the plaintiff was bound by the administrative rules. *Id.* at 592-93.

The trial court granted the plaintiff's motion for summary judgment on the ground that the rules actually did not require him to pay prevailing wages and that he had, therefore, complied with the contract. We affirmed. *Id.* at 593-94.

The Supreme Court reversed and remanded. The court concluded that neither ORS 183.400(2) nor any other provision of the APA conferred on the trial court authority to assess the validity of the administrative rule. The court first determined that BOLI's letter "made no final determination with regard to [the] plaintiff's duty to pay the prevailing wage rate, nor did it preclude further action by BOLI to enforce the prevailing wage rate law[.]" *Id.* at 595-96. Consequently, the court concluded, BOLI's letter was not reviewable under ORS 183.484 as a final order in other than a contested case. *Id.* The court concluded that the rules on which BOLI relied were also not subject to review under ORS 183.400(2) because they had been incorporated into the

terms of the contract with ODOT. According to the court, because the rules had been made terms of the contract, the validity of the rules themselves was no longer "at issue." *Id.* at 596-97.

This case is materially indistinguishable from *Coats*. As in *Coats*, we have in this case already determined that the letters from the lottery's analyst are not final orders in other than a contested case reviewable under ORS 183.484. In addition, as in *Coats*, the rules that petitioner seeks to challenge in this case were expressly incorporated into the contracts with the lottery. As a result, as in *Coats*, the rules, their validity, and their interpretation are not "at issue" in this case. The lottery was not seeking to enforce the rules, as such, but rather was seeking to enforce the terms of its contract with petitioner. Consequently, as the Supreme Court did in *Coats*, we conclude that, in this case, the circuit court lacked jurisdiction to review the petition under ORS 183.400(2).

Because we conclude that the trial court lacked jurisdiction to review the petition, we need not consider any of the other substantive or procedural issues that were raised in the appeal. Likewise, because we reverse the judgment, we necessarily also vacate the award of attorney fees. Finally, because of our disposition of the lottery's appeal, the cross-appeal pertaining to the trial court's denial of ancillary relief and certain additional attorney fees is now moot.

On appeal, vacated and remanded with instructions to dismiss petition for judicial review; supplemental judgment for attorney fees and costs vacated; cross-appeal dismissed as moot.