Argued and submitted December 2, 2004, judgment vacated and remanded with
instructions to enter judgment of dismissal December 14, 2005

Daryl HAWES
and Barbara Hawes,
doing business under the name and style of
Ft. Reading Ranch,
Baker County Farm Bureau,
a nonprofit corporation incorporated in the State of Oregon,
and Baker County Livestock Association,
a nonprofit corporation incorporated in the State of Oregon,
*Respondents,*

*v.*

STATE OF OREGON,
acting by and through the
Department of Environmental Quality,
the Department of Agriculture,
and the Environmental Quality Commission,
*Appellant,*

*and*

INSTITUTE FOR FISHERIES RESOURCES,
a nonprofit public benefit group;
Pacific Coast Federation of Fishermen's Associations,
a nonprofit trade association;
and Oregon Trout, a nonprofit organization,
*Intervenors below,*

*and*

NORTHWEST ENVIRONMENTAL DEFENSE CENTER
and Northwest Environmental Advocates,
*Intervenors-Appellants.*

00-198; A120374

125 P3d 778

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for appellant State of Oregon. With him on the briefs were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

James S. Coon argued the cause for intervenors-appellants. With him on the briefs was Swanson, Thomas & Coon.

Gregory T. Broderick argued the cause for respondents. With him on the brief were Russell Brooks and Pacific Legal Foundation, and John M. Groen and Groen Stephens & Klinge, LLP.

Before Haselton, Presiding Judge, and Brewer,* Chief Judge, and Linder, Judge.

LINDER, J.

---

* Brewer, C. J., *vice* Leeson, J. pro tempore.

## LINDER, J.

The dispositive issue in this case is whether a "memorandum of agreement" negotiated between the Oregon Department of Environmental Quality (DEQ) and the federal Environmental Protection Agency (EPA) constitutes a "final order" within the meaning of ORS 183.310(6)(b) of the Administrative Procedures Act. We conclude that it does not and that the circuit court therefore lacked jurisdiction over this proceeding. We accordingly vacate and remand with instructions to enter a judgment dismissing the action.

The memorandum of agreement between the DEQ and the EPA was the outgrowth of federal litigation brought by several environmental groups seeking to compel the EPA to enforce federal water quality standards in Oregon.[1] In particular, the agreement concerned the coordinated development of water quality standards known as total maximum daily loads ("load limits"), which limit the maximum amount of a pollutant that can be discharged—or "loaded"—into certain waters from all combined sources.[2] Under the federal Clean Water Act, load limits are to be established at levels "necessary to implement the applicable water quality standards." 33 USC § 1313(d)(1)(C). As part of the settlement of the federal litigation, the DEQ agreed to develop and implement load limits for certain streams whose water quality was impaired.[3] The agreement was memorialized in a "memorandum of agreement" that included both a list of impaired streams and a timetable by which the DEQ would create load limits for those streams. On the list of impaired streams was the Burnt River in Baker County.

Plaintiffs in this action are two Baker County ranchers, the Baker County Farm Bureau, and the Baker County

---

[1] *See generally NWEA v. Browner*, No. 00-679-HO (D Or Oct 17, 2000) (order approving consent decree).

[2] *See Dioxin/Organochlorine Center v. Clarke*, 57 F3d 1517, 1520 (9th Cir 1995) (describing meaning of total maximum daily loads). Total maximum daily loads typically are referred to by the shorthand "TMDLs." To avoid excessive jargon in this opinion, we instead refer to them as "load limits."

[3] Aspects of the agreement, such as the schedule for the completion of load limits on Oregon's waters, were also incorporated into a consent decree entered by the federal district court to resolve the federal litigation. *NWEA v. Browner*, No. 00-679-HO (D Or Oct 17, 2000) (unpublished order).

Livestock Association, all of whom anticipate that the DEQ will soon develop load limits for the Burnt River that will limit their agricultural activities on property adjoining the river. Accordingly, they brought this action under the APA challenging the DEQ's authority to create load limits for so-called "nonpoint source streams," which includes the Burnt River.[4] More precisely, plaintiffs' position is that the DEQ has the authority to create load limits for steams with "point sources" of pollution—that is, pipes, ditches, or other "points" from which pollutants are intentionally and legally discharged into a stream. But, according to plaintiffs, the DEQ lacks authority to create load limits for streams such as the Burnt River, which have only "nonpoint sources" of pollution—that is, pollutants that are the incidental result of runoff from, for example, timber operations, livestock grazing, and agricultural activities. The trial court agreed that the DEQ lacks the authority to create load limits for nonpoint source-only streams, and entered a judgment that, among other things, enjoined the DEQ from adopting load limits on those streams.

The DEQ and intervenors[5] appeal, renewing the arguments that they made to the trial court. In addition to addressing the DEQ's authority to develop and implement load limits for pollutants into nonpoint source-only streams, the DEQ and intervenors first raise a jurisdictional challenge. Specifically, they argue that the trial court lacked jurisdiction to review the memorandum under the APA because the agreement between the DEQ and the EPA was not a final order within the meaning of the pertinent judicial review provisions.[6] As we explain below, we agree. We therefore do not reach the question of the DEQ's authority.

---

[4] Plaintiffs pleaded three claims in their complaint. Plaintiffs' first claim for relief was for judicial review of an agency order under ORS 183.480 and ORS 183.484. Their second claim for relief was for declaratory judgment under ORS 183.480. Their third claim for relief was for an injunction under ORS 183.480. The trial court dismissed the second and third claims for relief. Only plaintiffs' first claim remains in the case.

[5] Intervenor-defendants are the Northwest Environmental Advocates and Northwest Environmental Defense Center, who were plaintiffs in the federal litigation that led to the memorandum of agreement between the EPA and the DEQ.

[6] In arguing that the agreement was not a final order under the APA, the DEQ seems to assume that the agreement may qualify as an "order," but one that lacks the requisite finality. Intervenors, on the other hand, urge that the agreement is not an order at all, because it is not an agency action "directed to a named person or named persons, other than employees, officers or members of an agency."

We begin with an overview of the agreement. The declared purpose of the agreement is to

> "provide a framework, schedule, and strategy to restore the quality of impaired waters within the State of Oregon to achieve Water Quality Standards, and to describe the methods and processes that the State of Oregon will use to develop and implement the requisite Total Maximum Daily Loads for waters listed on the 1998 303(d) list of Water Quality Limited Waterbodies[.]"

The DEQ's particular role is to establish the load limits for water quality impaired streams. In particular, the agreement provides that the

> "DEQ will prioritize, schedule, scope, develop and submit Total Maximum Daily Loads (TMDLs [or load limits]) for water quality limited segments on the state's 1998 303(d) list in accordance with the 'Schedule for TMDL Submittal' (Attachment A) by June 30, 2007. Submittal within one year of the date specified on the Schedule will be deemed timely."

Water quality impaired streams are those that violate ambient water quality standards—that is, general water quality standards that do not distinguish between sources of pollution—developed by the DEQ pursuant to ORS 468B.048 and Section 303 of the Clean Water Act. Under the agreement, the DEQ must place streams that are currently impaired, as well as those that are expected to become impaired within a specified period of time, onto the "303(d) list." Once that is done, in conformance with a schedule appended to the agreement, the DEQ must develop load limits for streams on the 303(d) list. The schedule calls for all load limits on the Burnt River to be developed by 2005, although load limits will be considered timely if the DEQ develops them within one year of the schedule's target dates.

The agreement sets forth particular provisions governing streams with only nonpoint sources of pollution, such as the segments of the Burnt River that are the concern of

---

ORS 183.310(6)(a). Because we conclude that the agreement in all events does not have the requisite finality to confer jurisdiction on a reviewing court, we do not reach the equally foundational question as to whether the agreement qualifies as an order at all.

this case. With regard to the nonpoint source streams, the agreement calls for the DEQ to consult with an extensive listing of agencies, citizens, and interest groups to develop the applicable load limits. Specifically, the agreement provides that the "DEQ will work with federal and state agencies, watershed councils, communities, counties, [soil and water conservation districts], citizens' groups, and others to identify data needs, collect, manage and analyze data and provide results to the public." It further provides that "[a] local advisory group will be established to assist [the] DEQ in obtaining the maximum amount of local input to the [load limit] development process." In conjunction with those various agencies and groups, the DEQ is to "conduct an assessment of the area characterizing the water quality problem, identifying potential causes and sources * * * and estimating relative contributions to the problem." The DEQ is then to "tak[e] the lead in certain key technical decisions" affecting the load limits and to review, and ultimately make decisions regarding, recommendations made by advisory groups on other elements of the load limits. Under the agreement, once load limits are developed, the DEQ must develop plans to implement those limits. Those plans, which are to include implementation time lines by which the DEQ expects water quality standards to be attained, are then submitted to the EPA, along with the load limits themselves. Although it does not approve or disapprove the implementation plans so developed, the EPA does review and approve or disapprove the load limits set by the DEQ.

The process is more involved for nonpoint source streams where the pollution arises from forestry or farming practices. For such streams, the agreement calls for the DEQ to work in conjunction with the Board of Forestry and the Oregon Department of Agriculture (ODA) to develop implementation plans for nonpoint sources of pollution arising from forestry and "farming practices on lands zoned for farm or other agricultural uses." For load allocations arising from agricultural activities, the ODA is to "convene an advisory committee" to assist in developing its water quality plans and in determining the boundaries within which they will apply. Working closely with the DEQ, the ODA is then to prepare an agricultural water quality management area plan. That

plan, in combination with the load limits set for streams polluted by agricultural activities, is the mechanism through which the load allocation for agricultural sources is to be met. As an implementation plan that the DEQ must review and forward to the EPA, along with the load limits themselves, the ODA plan must include implementation timelines by which the ODA and the DEQ expect water quality standards to be attained. Again, the EPA does not approve or disapprove the implementation plan. But it does approve or disapprove the load limits set forth in the plan. Finally, the agreement makes the ODA, not the DEQ, ultimately responsible for regulating farming practices for water quality improvement.

At the time that plaintiffs' sought judicial review of that agreement, the Burnt River had been placed on the 303(d) list of impaired streams, but the DEQ had not developed load limits for the river. The DEQ sought to dismiss the proceeding on the ground that the memorandum did not meet the definition of a final order that was subject to judicial review under the APA. The trial court declined to dismiss, explaining that the agreement was a final order because it had immediate adverse economic consequences for plaintiffs:

"Plaintiffs brought this case pursuant to the Oregon Administrative Procedures Act. The state seeks an immediate dismissal because the [agreement] is not a final order. The court finds that such a ruling would be extremely unjust and improper under the facts of this case. * * *

"* * * [T]he effects of the overreaching agreement require plaintiffs to act as though the temperature [load limit] of 0% load allocation for agricultural sources is implemented now because the modifications require time to implement. This [costs] plaintiffs[ ] money and devalues their property. Should [plaintiffs] wait to see if the temperature [load limit] of 0% load allocation for agricultural sources is implemented, enforcement could force them from their very livelihood because [plaintiffs] would be unprepared."

■■ The starting point for the analysis is the settled recognition that, under ORS 183.484, circuit courts have jurisdiction to review only "final" agency orders in other than contested cases. *Oregon Health Care Assn. v. Health Div.*, 329 Or

480, 488, 992 P2d 434 (1999) (so interpreting ORS 183.484 in light of other provisions of the APA); *Tidewater Contractors, Inc. v. BOLI*, 151 Or App 293, 298-99, 948 P2d 750 (1997), *rev den*, 326 Or 507 (1998) (same). ORS 183.310(6)(b) defines "final order" in broad terms to mean "final agency action expressed in writing." The definition then expressly—and more helpfully, for our purposes in this case—declares what does not qualify as a final order:

> " 'Final order' does not include any tentative or preliminary agency declaration or statement that:
>
> "(A)   Precedes final agency action, or
>
> "(B)   Does not preclude further agency consideration of the subject matter of the statement or declaration."

ORS 183.310(6)(b). Under that definition, whatever else may or may not qualify as a "final order," as a matter of plain text, an agency declaration or statement is not a final order for purposes of judicial review if that declaration or statement (1) precedes final agency action, or (2) does not preclude further agency consideration of the subject matter of the statement or declaration.

■         Here, extended analysis is not necessary to conclude that the agreement between the DEQ and the EPA is not a "final order" within the meaning of ORS 183.310(6)(b) because the agreement precedes final agency action. The agreement is, in effect, a blueprint for how the DEQ (and other agencies and entities) will go about adopting load limits for water quality impaired streams throughout the state. The point of the agreement was to settle federal litigation designed to force the DEQ and the EPA to carry out what the federal plaintiffs perceived to be the agencies' obligations under the federal Clean Water Act. To that end, the agreement memorializes the agencies' commitments to a process by which they will carry out those obligations, but the agreement does not declare the outcome of that process (*e.g.*, the load limits or the plans to implement them). Rather, the agreement expressly calls for significant future action by the DEQ in the development, implementation, and enforcement of the load limits. Thus, by its terms, the agreement is "preliminary" and "precedes final agency action." *See Oregon*

*Restaurant Services v. Oregon State Lottery*, 199 Or App 545, 556-57, 112 P3d 398, *rev den*, 339 Or 406 (2005) (agency letters advising petitioner of regulatory violations were not final orders where letters were only the initial step in the compliance process and further agency action was required); *Tidewater Contractors, Inc.*, 151 Or App at 298-99 (BOLI letter informing contractor of obligation to pay prevailing wage rate for a particular job was not a final order because it was not a final determination of contractor's obligation and did not preclude further action to enforce the law).[7]

Plaintiffs, in arguing to the contrary, rely primarily on the exclusion in subparagraph (B) of ORS 183.310(6)(b), which provides that an order is not final if it "[d]oes not preclude further agency consideration of the subject matter." Plaintiffs assert that, here, the agreement contains the DEQ's statement or declaration of its authority and duty to promulgate load limits. Plaintiffs further assert that the agreement does preclude further consideration of that statement because the agreement is binding on the DEQ and not subject to reconsideration. The DEQ disputes the legal accuracy of that assertion, pointing to provisions in the agreement that give the DEQ the ability to rescind the agreement as long as it provides the EPA with 180 days' notice of its intent to do so.

We need not decide, however, which party is correct on that score. The two express exclusions set out in ORS 183.310(6)(b) are stated in the alternative. That is, if the agreement *either* (1) precedes final agency action, *or* (2) does not preclude further agency consideration of the subject matter of the agreement, it is not final for purposes of judicial review. Here, then, even if we assume that the DEQ may not revisit the question of its authority and duty to determine and implement load limits, the fact remains that there are

---

[7] We cite and rely on *Oregon Restaurant Services* and *Tidewater Contractors, Inc.,* with some caution. Our final order analysis in those cases appears to have been based on both the "precedes final agency action" and "does not preclude further agency consideration of the subject matter" prongs of ORS 183.310(6)(b). Both cases discussed whether the challenged agency determination "precludes further agency *action*," which blends the two standards. In many cases, there may be considerable overlap between the two prongs and the analysis will be the same under either. In this case, the two prongs potentially lead to different conclusions, as we discuss.

still many more steps to be taken in the process of executing that authority, and the DEQ has not yet taken final action. The agreement reflects the DEQ's determination that it has authority to act, which is a predicate determination that any agency must make when it proposes to take particular action.

To be sure, the agreement has more binding characteristics than—for example—a press release, a letter to potentially interested citizens, or some other public announcement of the agency's intent to proceed. And, depending on just *how* legally binding it in fact is, the agreement's status as a formally memoralized understanding between two governmental entities may mean that it does not satisfy the exclusion under subparagraph (B) of ORS 183.310(6)(b). But that is not enough to make it a final order. The agreement must, at a minimum, also satisfy subparagraph (A), which requires it to not "precede final agency action." But here it does precede final agency action, just as would any other initial declaration of an agency's authority to act in advance of taking action. A contrary conclusion could result in piecemeal judicial review, first of an agency's announced authority to act, then of the final actions taken pursuant to that announced authority. Such piecemeal review is the antithesis of what the definition of final order, together with the other review provisions of the APA, are designed to achieve. At the point at which the DEQ takes final action, plaintiffs will be entitled to challenge the lawfulness of that action by, among other things, challenging the correctness of the DEQ's determination that it has authority to act. *See* ORS 183.484(5)(a) (on judicial review of a final order, court may grant relief if agency has erroneously interpreted a provision of law).[8]

Next, and seemingly in the alternative, plaintiffs rely on two cases, *Oregon Env. Council v. Oregon State Bd. of Ed.*, 307 Or 30, 761 P2d 1322 (1988), and *Aplanalp v. Board of Optometry*, 21 Or App 501, 535 P2d 573 (1975), for the

---

[8] The parties dispute whether the final agency action in this case would be developing load limits or implementation plans, attempting to enforce the load limits, or taking other actions in the process contemplated by the agreement. Any observations about that on our part would be purely advisory and *dicta*. We therefore decline to express any view as to what eventual DEQ actions or declarations may qualify as final orders for purposes of ORS 183.310(6)(b).

proposition that an agency's statement or declaration may be considered a final order even if it precedes further action. Neither of those cases, however, interpreted the term "final order" as it is defined in ORS 183.310(6)(b). As we have previously explained, the "sole issue" in *Aplanalp* was

> "whether an optometrist could challenge the Board of Optometry's cease and desist order without having to wait for the board to revoke his license. Citing a line of decisions concerning the ripeness of declaratory judgment claims, we concluded that the optometrist could challenge the cease and desist order. We did not apply the definition of the term 'final order' in ORS 183.310(6)(b); that provision had not yet been enacted."

*Oregon Restaurant Services*, 199 Or App at 557 (internal citations omitted). Because *Aplanalp* did not involve the meaning or application of the term "final order" in ORS 183.310(6)(b), it is not helpful or on point here.

Likewise, in *Oregon Env. Council*, the Supreme Court did not discuss whether the agency decision in question was a "final" order within the meaning of ORS 183.310(6)(b). *See* 307 Or at 43-44. Indeed, the decision in that case preceded by several years the Supreme Court decision in *Oregon Health Care Assn.*, 329 Or at 488, which held that circuit courts have jurisdiction to review only "final" agency orders in other than contested cases. In *Oregon Env. Council*, the issue was only whether the Board of Education's decision approving a particular textbook for use in state schools qualified as an "order" at all and, if so, whether it was an order in a contested case.[9] *See* 307 Or at 35-36. Because

---

[9] Even if the decision in *Oregon Env. Council* must somehow be read as implicitly concluding that the board's textbook decision was a "final order" within the meaning of ORS 183.310(6)(b), there remains a significant distinction between the order in that case and the order in this one. The challenged board decision in *Oregon Env. Council* was one to place a particular text book on the list of approved textbooks. That decision "preceded" further action in the sense that school boards could then choose to select and use that textbook. 307 Or at 32. But any further action of that kind was action by a different agency or entity—a local school board—not further action of the board. In terms of the board's role in textbook selection, nothing else remained to be done. Thus, the board's action in approving the textbook for placement on the list of approved books was the final act by *that* agency in the textbook selection process. In terms of its tentative or preliminary nature, the board's action therefore was not similar or analogous to the agreement challenged in this case, which contemplates and precedes several more steps that the DEQ must take in developing, adopting, and implementing load limits.

*Oregon Env. Council*, like *Aplanalp*, did not purport to apply or even consider whether the declaration involved was a "final order," it too is not helpful or on point here.[10]

As a final argument, plaintiffs maintain that, even if the agreement is not a final order, it is still reviewable under ORS 183.480(3) because the DEQ is proceeding without probable cause and because plaintiffs will be irreparably harmed by the state's action. In that regard, plaintiffs rely on the reasoning articulated by the trial court for concluding that it had jurisdiction to reach the merits of plaintiffs' challenge.[11] As we explain, however, to review a challenge under ORS 183.480(3), plaintiffs must have invoked the circuit court's jurisdiction other than under the APA. Because the only claim remaining in this case at this procedural juncture is plaintiffs' APA claim, we cannot consider their argument.

---

[10] Plaintiffs also rely on *Ellis v. Roberts*, 302 Or 6, 725 P2d 886 (1986), but they appear to do so only to argue, in response to intervenors, that the agreement constituted an "order," not to urge that it was a "final order." *Ellis* in fact provides no guidance on the finality analysis, and only uncertain guidance on the question of what qualifies as an order at all for purposes of the APA. *Ellis* involved an action challenging the Secretary of State's certification of a ballot measure under ORS 246.910(1), not under the APA. 302 Or at 8. That statute permits an adversely aggrieved person to challenge "any act or failure to act" by the Secretary of State under any election law and has no requirement that the actions be final or otherwise be ones that do not precede further final action. The issue to be decided in *Ellis* was whether there were any time limits on bringing a challenge to a decision under ORS 246.910(1). The court inferred a "reasonable time" limit by "looking to other expressions of legislative policy on questions like this," which included the provisions of the APA setting the time (60 days) for review of orders in other than contested cases. *Ellis*, 302 Or at 18; *see also State ex rel Bunn v. Roberts*, 302 Or 72, 80, 726 P2d 925 (1986) (characterizing *Ellis* as using the APA provision "by analogy" to determine the time to bring a challenge to a ballot certification). Fundamentally, however, *Ellis* involved a legislative scheme in which the Secretary of State is charged with taking a series of actions in submitting a ballot measure to the voters and the legislature has provided expressly for judicial review at each discrete step of the process to ensure meaningful review and to avoid havoc in the election cycle. *Ellis*, 302 Or at 15-18. This case involves nothing similar, either substantively or procedurally. Here, the DEQ's declaration in the agreement is the equivalent of the Secretary of State announcing that he or she *will* review ballot measures for "one subject compliance" without having actually made any such review yet, which is nothing that *Ellis* held to be reviewable. Moreover, the DEQ's determinations and actions are reviewable only pursuant to the general provisions of the APA, not pursuant to a special legislative scheme designed to provide for judicial review at intermediate steps in the process.

[11] The DEQ does not concede that the record establishes the requisite irreparable harm to plaintiffs. We do not have to decide that question, however.

■     ORS 183.480(3) provides:

"No action or suit shall be maintained as to the validity of any agency order except a final order as provided in this section and ORS 183.482, 183.484, 183.490 and 183.500 or except upon showing that the agency is proceeding without probable cause, or that the party will suffer substantial and irreparable harm if interlocutory relief is not granted."

In *Oregon Health Care Assn.*, the Supreme Court held that the two criteria identified in ORS 183.480(3)—proceeding without probable cause or substantial and irreparable harm—do not provide an independent basis for jurisdiction to judicially review an agency action. 329 Or 480. Instead, those criteria are grounds to challenge a nonfinal order after the court's jurisdiction has been otherwise properly invoked. The court observed:

"First, as we have discussed, in the absence of a final order, judicial review of a *nonfinal* order under ORS 183.482 and ORS 183.484 is a contradiction in terms. The premise for judicial review under those statutes is a final order. Except as provided in ORS 183.490, only on review of a final order may a court consider a claim that, during its consideration of the matter, the agency issued an erroneous nonfinal order that warrants relief under ORS 183.482(8) or ORS 183.484(4)."

*Id.* at 492 (emphasis original). The court went on to observe that, although ORS 183.480(3) creates exceptions that permit limited challenges to nonfinal orders, the exceptions do not, in and of themselves, confer jurisdiction on a court to hear those challenges:

"Second, the text of ORS 183.480(3) contains other important clues about the proper forum for challenging a nonfinal order. That statute does not grant jurisdiction to any court to decide any claim. Instead, ORS 183.480(3) proceeds on the premise that *other* statutes create jurisdiction in a court to consider one of the listed exceptions. As already noted, ORS 183.482(1) vests jurisdiction in the Court of Appeals for judicial review of contested cases, ORS 183.484(1) vests jurisdiction for judicial review of orders in other than contested cases in the circuit court, and ORS 183.480(1), (2), and the first exception in (3) confine judicial review to a final order. No statute in the APA grants jurisdiction to any

court to consider the showings described in the second and third exceptions in ORS 183.480(3)."

*Id.* (emphasis in original). The court then explained how a party relying on the second and third exceptions in ORS 183.480(3) might invoke the court's jurisdiction to challenge a nonfinal order:

"ORS 183.480(3) * * * indicates that the showings described in the second or third exceptions may be made in an 'action or suit.' In context, that phrase refers to the forms of action that a circuit court may entertain under other statutory grants of jurisdiction. A proceeding in circuit court affords a person or party to an agency proceeding an opportunity, by 'action or suit,' to challenge the validity of an agency's order, as described in ORS 183.480(3), by showing that the agency is proceeding without probable cause, or that the party will suffer substantial and irreparable harm if non-final relief is not granted."

*Id.* In summary, the court concluded:

"The legislature intended that a person or party would make the showings required by the second and third exceptions in ORS 183.480(3) in an 'action or suit' in circuit court, and that the process of judicial review under ORS 183.482 and ORS 183.484 would address claims of error only in a final order."

*Id.* at 494.

In this case, plaintiffs' amended complaint contained three claims, all of which stated that relief was sought pursuant to ORS 183.484 and/or ORS 183.480. Arguably, at least, plaintiffs' second claim for relief might be understood to invoke the trial court's jurisdiction under the Declaratory Judgment Act, ORS 28.010 to 28.110. As earlier described, 203 Or App at 259 n 4, plaintiffs' second claim was labeled in the complaint as arising under ORS 183.480. In the body of that claim, the complaint further alleged that plaintiffs were seeking "declaratory relief under ORS chapter 28." Thus, that claim possibly could be understood to have pleaded an action under ORS chapter 28, satisfying the "action or suit" requirement for judicial review of nonfinal orders under ORS 183.480(3), as explained in *Oregon Health Care Assn.* The trial court, however, dismissed plaintiffs' second and

third claims. Although plaintiffs initially filed a cross-appeal from the dismissal of those claims, they later filed a "notice of abandonment" of their cross-appeal. Plaintiffs further affirmed in their brief that they "now abandon those claims on appeal." As a result, the second and third claims are no longer in this case and can provide no basis for circuit court jurisdiction. In other words, because those claims furnished the only arguable basis for plaintiffs to contend in this court that the trial court's jurisdiction was properly invoked under ORS 183.480(3), and those claims are now gone, we are unable to reach plaintiffs' argument that the trial court had jurisdiction to review the agreement under the "irreparable harm" criterion of ORS 183.480.

Judgment vacated and remanded with instructions to enter judgment of dismissal.